In re G–I HOLDINGS, INC. f/k/a GAF Corporation, et al., Debtors.

G–I Holdings, Inc., Plaintiff,

v.

Those Parties Listed on Exhibit A, et al., Defendants.

Bankruptcy No. 01–30135(RG).

Adversary No. 01–3013(RG).

United States Bankruptcy Court, D. New Jersey.

June 8, 2004.

Dennis J. O'Grady, Mark E. Hall, Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, Martin J. Bienenstock, Debra L. Goldstein, Kathryn L. Turner, Weil, Gotshal & Manges LLP, New York, NY, Co–Attorneys for the Debtors and Building Materials Corporation of America.

Jeffrey D. Prol, Jeffrey A. Kramer, Lowenstein Sandler, PC, Roseland, NJ,

Trevor W. Swett, Max C. Heerman, Caplin & Drysdale, Washington, DC, Co–Counsel to Official Committee of Asbestos Claimants.

David R. Gross, Nancy A. Washington, Saiber, Schlesinger, Satz & Goldstein LLC, Newark, NJ, Michael L. Scheier, Keating, Muething & Klekamp, P.L.L., Cincinnati, OH, Co–Counsel for the Legal Representatives of Present and Future Holders of Asbestos–Related Demands.

William S. Katchen, Duane Morris, LLP, Newark, NJ, Theodore Gewertz, Esq., Wachtell, Lipton, Rosen & Katz, New York, NY, Co–Counsel for the Bank of New York.

## OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

This matter is before the Court on a motion filed by the Official Committee of Asbestos Claimants (hereinafter the "Committee") seeking four separate, but interrelated, forms of relief. First, the Committee requests that this Court modify the February 22, 2002 Preliminary Injunction entered in this case so as to permit the Committee to commence an adversary proceeding as the representative of the Debtor G–I Holdings, Inc.'s (hereinafter "G–I Holdings") estate for the purposes of: a) avoiding and recovering the transfer of GAF Corporation's[1] roofing business to Building Materials Corporation of America (hereinafter "BMCA") in 1994; b) avoiding certain liens imposed on the assets of that roofing business in connection with a December, 2000 refinancing;[2] and c) avoiding and recovering payments made "under color of those liens" after the filing of G–I Holdings' bankruptcy petition.

Second, the Committee requests that this Court confer upon it, pursuant to §§ 1103(c)(5), 1109(b), and 105 of the Bankruptcy Code, the requisite authority to file and prosecute such a suit on behalf of the G–I Holdings estate and its creditors. Third, the Committee requests that this Court prohibit BMCA from carrying out its proposed issuance of new public notes, or any other related financing transaction, pending the resolution of this motion.[3] Fourth, the Committee seeks an order "prohibiting BMCA from pre-paying outstanding notes as an inducement to existing Noteholders to 'roll over' their present holdings by investing in BMCA's proposed new notes."

Both G–I Holdings and BMCA have submitted formal objections to the motion filed by the Committee. The Bank of New York (hereinafter "BNY") also filed a formal objection to the Committee's motion. Further, the Legal Representatives of Present and Future Holders of Asbestos–Related Demands (hereinafter "Legal Representative") filed papers with the Court "fully" supporting the motion filed by the Committee.[4]

---

1. G–I Holdings is the successor in interest to GAF Corporation.

2. More specifically, and as will be discussed below, a first lien in favor of a consortium of banks led by the Bank of New York, and a second lien in favor of the holders of BMCA's publicly-issued notes (hereinafter the "Noteholders").

3. Moreover, the Committee requests that if this motion is granted, the Court should provide it with a thirty-day "interval" for the filing of the contemplated adversary proceeding, during which time BMCA would be prevented from executing its proposed refinancing.

4. As stated in its supporting papers, the Legal Representative is participating in this contested matter at this time as a "party in interest" under § 1109(b) of the Code, rather than as a co-movant. However, the Legal Representative submits that if this Court grant's the

This Court conducted a hearing with respect to the motion on March 29, 2004, at which time the Court reserved decision. The following constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. *See* FED. R. BANKR.P. 7052. Pursuant to 28 U.S.C. § 157, this matter is a core proceeding. *See generally* 28 U.S.C. § 157(b) (1994). Further, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. *See* 28 U.S.C. § 1334 (1993). Finally, venue is proper pursuant to 28 U.S.C. § 1409(a) (1993).

## I. Parties Involved In This Motion

On January 5, 2001, G–I Holdings, which is a holding company, filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On August 3, 2001, ACI, Inc., a subsidiary of G–I Holdings, filed a voluntary Chapter 11 petition. On October 10, 2001, this Court entered an Order directing the joint administration of the G–I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G–I Holdings has been operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a)(West 2004); *see also* 11 U.S.C. § 1108 (West 2004). G–I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos actions prior to merging into G–I

Holdings. The Committee submits that as successor-in-interest to GAF, G–I Holdings remains liable for approximately 150,-000 asbestos lawsuits filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims that will be filed in the future.

BMCA is an indirect subsidiary of G–I Holdings, and is also the primary operating subsidiary and principal asset of G–I Holdings. Significantly, BMCA is not a "debtor," as defined in § 101(13) of the Bankruptcy Code, in any bankruptcy proceeding. Established in 1994, BMCA received substantially all the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability, with G–I Holdings indemnifying BMCA against any additional asbestos liability. Notwithstanding that BMCA claims to have never manufactured any products containing asbestos, the Company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September, 2000. Simply stated, the claims against BMCA are premised upon theories of successor liability or alter ego.

The Committee is an official committee of creditors appointed on January 22, 2001 by the United States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffer injuries related to the inhalation of asbestos from products manufactured by the predecessors of G–I Holdings. *See* 11 U.S.C. § 1102(a)(West 2004).[5] Further, the Legal Representative is a fiduciary appointed by the Court to represent per-

---

Committee's motion, it "reserves all rights to seek to intervene as a co-representative of the estate to prosecute the avoidance actions" contemplated by the Committee's motion.

**5.** Section 1102(a)(1) of the Bankruptcy Code provides in relevant part: "[A]s soon as practicable after the order for relief under [C]hap-

ter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a) (West 2004).

sons who hold present and future asbestos-related claims against G–I Holdings. Finally, BNY is both a participant and agent for a group of institutional lenders with revolving credit working capital agreements with BMCA.

## II. Factual And Procedural Background

On January 8, 2001, several days after filing for relief under Chapter 11 of the Bankruptcy Code, G–I Holdings moved pursuant to § 105(a) [6] of the Code seeking a preliminary injunction prohibiting the filing or prosecution of present and future asbestos claims against BMCA, pending confirmation of a plan of reorganization for G–I Holdings or the issuance of a declaratory judgment as to whether BMCA bears successor liability or alter ego liability for asbestos claims. According to G–I Holdings, an injunction was necessary to protect the value of the estate, because otherwise BMCA would itself be forced into bankruptcy.

Moreover, contending that all asbestos claims against BMCA are also essentially pending against G–I Holdings based upon the parties' indemnification agreement, G–I Holdings argued that this Court would lose its ability to fashion a uniform and efficient method of resolving asbestos claims if the asbestos claimants were permitted to prosecute their respective claims in various courts throughout the country. BNY appeared in the matter, joining G–I Holdings' application for a preliminary injunction. The Committee interposed an objection, contending that this Court should not exercise jurisdiction over a non-debtor third party by extending the automatic stay to such third parties where the litigation would otherwise not affect property of the bankruptcy estate.

On February 8, 2001, the Committee commenced an adversary proceeding against G–I Holdings, BMCA Holdings Corporation, and BMCA (hereinafter the "Substantive Consolidation Action"). (*See Appendix of the Committee*, Vol. 1, Exhibit "12")(hereinafter "*Comm. Appx.*"). In this two-count adversary proceeding, the Committee first requests that the Court substantively consolidate G–I Holdings and BMCA, *nunc pro tunc,* as of January 5, 2001, the date G–I Holdings filed its Chapter 11 petition. The second count of the Substantive Consolidation Action seeks, in the alternative, a "permanent mandatory injunction directing [G–I Holdings] to take all corporate action necessary to cause BMCA to file immediately a petition under Chapter 11 of the Bankruptcy Code." After a three day evidentiary hearing this Court denied the Committee's request for interim substantive consolidation. *See Official Comm. of Asbestos Claimants v. G–I Holdings, Inc. (In re G–I Holdings, Inc.),* 2001 WL 1598178 (Bankr.D.N.J.2001). This Substantive Consolidation Action is still pending before this Court.

On February 7, 2001, G–I Holdings and BMCA commenced an adversary proceeding in this Court for a judgment declaring that BMCA was not liable as a successor or alter ego for G–I Holdings' asbestos liabilities (hereinafter the "Successor Liability Action"). The Committee intervened as a defendant and counterclaimed for a judgment declaring that BMCA was liable for G–I Holdings' asbestos liabilities under theories of successor liability and "piercing the corporate veil." The Successor Liability Action is currently pending in the Unit-

---

**6.** Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See* 11 U.S.C. § 105(a) (West 2004).

ed States District Court for the District of New Jersey.[7]

By Order dated February 22, 2002[8], this Court granted the relief requested by G–I Holdings and entered a preliminary injunction enjoining any asbestos claimants from prosecuting pending actions[9] and future actions[10] against either G–I Holdings or BMCA. Moreover, the preliminary injunction order permits BMCA to continue to operate its business in the ordinary course as a nondebtor, but requires BMCA to make certain disclosures to the Committee with respect to its operations and financing, and prohibits BMCA from engaging in certain specified transactions without first providing thirty-days' notice to the Committee. The transactions subject to this notice requirement include the refinancing or replacement of BMCA's existing credit facility with BNY,

as well as the making of any pre-payments on BMCA's outstanding public notes.[11]

Particularly relevant to this motion is a provision in the preliminary injunction order that addresses the tolling of statutes of limitations. This provision provides as follows:

> [O]n consent and agreement of BMCA, all statutes of limitations and statutes of repose *that had not expired as of January 5, 2001*, with respect to any and all claims against BMCA or any of its subsidiaries arising out of alleged exposure to asbestos or asbestos containing products of GAF Corporation or its predecessors or affiliates, including, without limitation, claims based on theories of successor liability, alter ego, fraudulent conveyance, or piercing the corporate veil are tolled until sixty days after the above captioned Adversary Proceeding and Adversary Proceeding No. 01–3066,

---

**7.** The District Court withdrew the standing reference to the Bankruptcy Court.

**8.** Although the formal preliminary injunction order was not entered until February 22, 2002, the Court rendered its decision on the record granting the preliminary injunction on June 22, 2001. At the Court's direction, the parties negotiated the specific terms and conditions of the injunctive relief. This process took more than six months and necessitated numerous Court appearances during which the Court provided guidance to the parties in fashioning appropriate terms and conditions to be placed in the written preliminary injunction order.

**9.** "Pending actions" was defined in the preliminary injunction order as "those actions pending prior to the commencement of this adversary proceeding ... that seek damages against [G–I Holdings] and BMCA for alleged personal injuries purportedly arising out of exposure to asbestos or asbestos-containing products."

**10.** "Future actions" was defined in the preliminary injunction order to include "actions that may be brought by prospective plaintiffs

against BMCA any time after the filing of the Complaint and during the pendency of G–I's chapter 11 case that seek damages for alleged personal injuries purportedly arising out of their or their decedent's exposure to asbestos or asbestos-containing products."

**11.** By way of example, these provisions provide in relevant part: without thirty (30) days' prior written notice to the Committee, BMCA shall not-"(a) refinance or replace the Credit Agreements or waive in any material respect any covenant or other provision[] of the Credit Agreements; (b) except as permitted under ... the existing Credit Agreements refinance, replace or amend or waive in any material respect, any covenant or other provision of the receivables financing facility, notes, indentures, security agreements or related instruments or enter into any new notes, indentures, receivables financing facility, security agreements, or related instruments; (c) make any pre-payments on senior notes or indentures, provided that interest payments, payments falling due under the existing terms of the senior notes or indentures or payments made in the ordinary course of business consistent with past practice, are not deemed pre-payments."

sometimes referred to as the Declaratory Relief Action, have been disposed of by final, non-appealable judgments, orders or decrees. . . .

[T]he Debtor and BMCA shall be estopped to deny the tolling of statutes of limitation and statutes of repose as set forth above. . . .

[ (*Comm. Appx.*, Vol. 1, Exhibit "1")(emphasis added).]

During a July 19, 2001 hearing, this Court clarified the intended scope of the preliminary injunction order by stating:

It was never the intention of the Court in determining that conditions be drafted on the injunction to not allow BMCA, which is admittedly a non-debtor and still remains a non-debtor notwithstanding the Debtor's success in obtaining a preliminary injunction, it was never the intent of this Court to not allow normal course transactions to proceed. . . . So if there has been some misapprehension to not have normal course transactions proceed in the normal course, I know of no authority that would have me impose conditions that would not allow a non-debtor to do business.

[ (*See Joint Appendix of G–I Holdings and BMCA,* Exhibit "12," pgs. 64–65) (hereinafter *"Debtor's Appx."*).]

Pursuant to the terms of the February 22, 2002 preliminary injunction order, on January 9, 2004 counsel for G–I Holdings notified counsel for the Committee of its intent to issue "up to $150 million of new Senior Secured Notes." (*See Comm. Appx.,* Vol. 1, Exhibit "3"). According to counsel for G–I Holdings, the proceeds generated from the issuance of these notes "will be used to redeem the 8 5/8% Senior Secured Notes due [in] 2006 under the optional redemption provision included in the 2006 Notes." (*See Comm. Appx.,* Vol. 1, Exhibit "3"). This redemption will cost approximately $101.4 million. The remainder of the proceeds, approximately $50 million, will be used for "general corporate purposes and fees," including the purchase of outstanding BMCA Senior Notes. (*See Comm. Appx.,* Vol. 1, Exhibit "3").

During a conference call conducted by the Court on February 13, 2004, counsel for BMCA informally advised both the Committee and the Court that it was modifying the terms of the proposed refinancing transaction. Counsel for BMCA stated that BMCA may wish to draw down on its existing $350 million line of credit in order to fund the pre-payment of its outstanding notes, and then repay any amounts drawn from its line of credit through the issuance of new notes. The Committee objected to this alternate method of pre-paying the notes due in December of 2006.

On February 28, 2004, the Committee filed an objection to BMCA's refinancing proposal by way of this motion. As previously indicated, the Committee requests that the Court modify the preliminary injunction so as to authorize it to commence an adversary proceeding against BMCA, BNY, and the Noteholders. According to the Committee, the adversary proceeding would include: 1) avoiding and recovering the transfer of G–I Holding's roofing business to BMCA in 1994 (referred to as the "Pushdown"); 2) avoiding certain liens imposed on the assets of the roofing business in connection with a December, 2000 refinancing (referred to as the "Securitization"); and 3) avoiding and recovering payments made "under color of those liens" after the filing of G–I Holding's bankruptcy case. The Committee also seeks an order pursuant to §§ 1103(c)(5), 1109(b) and 105 of the Bankruptcy Code conferring upon it the requisite authority to file and prosecute the proposed adversary proceeding on behalf of the G–I Holdings estate and its creditors.

More specifically, the Committee proposes to assert two sets of claims. The first set of claims will challenge the Pushdown as a fraudulent conveyance of G–I Holdings' roofing business under state law pursuant to 11 U.S.C. § 544(b) of the Bankruptcy Code. The Committee intends to sue BMCA as the "initial transferee" under 11 U.S.C. § 550(a)(1). Moreover, the Committee plans to join the BNY Banks and the Noteholders as "mediate or immediate transferees" under 11 U.S.C. § 550(a)(2) on the theory that the Securitization transaction "constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown." (*See Memorandum in Support of the Official Committee of Asbestos Claimants for Modification of the Preliminary Injunction,* pg. 6)(hereinafter *"Comm. Br."*).

The second set of claims proposed by the Committee will challenge the Securitization transaction and the subsequent payments to the BNY Banks and the Noteholders "as voidable and recoverable transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and 550(a)" of the Bankruptcy Code. (*Comm. Br.,* pg. 6). According to the Committee, the BNY Banks and the Noteholders will be joined on these claims "as initial, mediate, or immediate transferees of the encumbrances granted in the Securitization" transaction. (*Comm. Br.,* pg. 6). The Committee submits that the various claims challenging the Securitization transaction "will be predicated on the contention that BMCA must be collapsed with G–I [Holdings] on grounds of alter ego or substantive consolidation, or that the assets subjected to the liens constitute property of [G–I Holdings] that was fraudulently conveyed in the Pushdown." (*Comm. Br.,* pg. 6).[12]

In addition to filing an adversary proceeding, the Committee also requests that if its motion is granted, the Court should prevent BMCA from executing its proposed financial transactions for a thirty (30) day period, in order to give the Committee sufficient time to file and serve the proposed action. Finally, the Committee also seeks to prohibit BMCA from "prepaying outstanding notes as an inducement to existing Noteholders to 'roll over' their present holdings by investing in BMCA's proposed new notes, and from using BMCA's short-term bank credit facility to pre-pay or repurchase long-term note obligations."

## A. The "Pushdown" Transaction

In early 1994, GAF Building Materials Corporation, an indirect subsidiary of GAF, formed a new corporation as a wholly-owned subsidiary, which came to be known as BMCA. (*Comm. Br.,* pg. 8). In accordance with a "Reorganization Agreement" dated "as of" January 31, 1994, GAF Building Materials Corporation transferred substantially all of its roofing business to BMCA. (*Comm. Br.,* pg. 9).

Pursuant to the Reorganization Agreement, BMCA assumed liability for "the first $204 million of Asbestos Liabilities payable relating to claims for bodily injury pending as of the date hereof, or settled prior to the date hereof, whether for indemnity or defense, after giving effect to any insurance or other third party recoveries available to GAF. . . ." (*Comm. Br.,* pg. 9). According to the Committee, GAF and

---

**12.** In support of its motion, the Committee filed as its "Exhibit 32" a "Summary of Claims to be asserted by [the] Official Committee of Asbestos Claimants in [the] Proposed Action for the Benefit of the G–I Holdings Estate." The "Summary of Claims" proposes six separate avoidance causes of action against BMCA, BNY, and the Noteholders.

GAF Building Materials Corporation purportedly agreed to indemnify BMCA, jointly and severally, from any asbestos liability over and above its assumed $204 million obligation. (*Comm. Br.*, pg. 9).

The parties differ as to their characterization of the Pushdown transaction. As alleged by the Committee, "[t]he Pushdown was intended to ensure that asbestos claimants and others could not enforce their tort claims against the assets and business transferred to BMCA, except to the extent of BMCA's limited express assumption of liability." (*Comm. Br.*, pg. 9). By contrast, G–I Holdings and BMCA submit that the rationale for forming BMCA to purchase the GAF roofing business was to afford the roofing business "better access to capital markets." (*See Reply Brief on Behalf of G–I Holdings and BMCA*, pg. 13)(hereinafter "*G–I Reply Br.*"). G–I Holdings and BMCA contend that this business decision succeeded because today BMCA is the country's leading manufacturer of premium residential and commercial roofing products. (*G–I Reply Br.*, pg. 13). Specifically, since 2000 BMCA's operating income has "increased by approximately $52 million, sales have gone from $1.2 billion to approximately $1.4 billion and EBITDA [13] has also increased by $58 million." (*G–I Reply Br.*, pg. 16). Consequently, G–I Holdings and BMCA maintain that this business restructuring has created increased value for the G–I Holdings' asbestos creditors.

## B. The "Securitization" Transaction

In December of 2000, BMCA engaged in two financial transactions by which the Company encumbered all the assets of its roofing business through a first lien in favor of the BNY Banks [14] and a second lien on those same assets in favor of the Noteholders. (*Comm. Br.*, pg. 10). With respect to the first lien, in 1999 the BNY Banks provided BMCA with an unsecured revolving credit facility of $110 million, with a maturity date of August, 2002. (*Comm. Br.*, pg. 10). In exchange for granting a first lien on the assets of the roofing business in favor of the BNY Banks, the BNY Banks agreed to extend the maturity date of the existing revolving credit facility to August of 2003, and made available to BMCA a new revolving credit line of up to $100 million. (*Comm. Br.*, pg. 10). According to the Committee, this first lien not only secured BMCA's obligations under the new facility, but also "bootstrapped into a secured position approximately $100 million in loans and credits that were already outstanding under the old facility and certain other pre-existing obligations amounting to approximately $10 million, such that the total secured claims of the BNY Banks ... came to $220 million." (*Comm. Br.*, pg. 10).

In December of 2000, BMCA granted a second lien on the assets of its roofing business in favor of the Noteholders in purported exchange for the Noteholders' consent to granting the first lien in favor of the BNY Banks. (*Comm.Br.*, pgs. 10–11). At the time of this transaction, the Noteholders held approximately $540 million in outstanding notes that BMCA had issued to public markets over the course of several years. (*Comm. Br.*, pgs. 10–11). The Noteholders apparently did not advance any additional funds or funding commitment to BMCA in connection with the

---

**13.** "EBITDA" is an accounting term of art and abbreviation for "earnings before interest, taxes, depreciation, and amortization."

**14.** The BNY Banks include BNY, Fleet National Bank, Bank of Nova Scotia, Chase Manhattan Bank, and Bear Stearns Corporate Lending, Inc.

granting of the second lien. (*Comm. Br.*, pg. 11).

As with the Pushdown transaction, the parties disagree on the characterization of the Securitization transaction. The Committee argues the Securitization transaction "was a further step in a direction that had been set by the Pushdown in 1994"; that is, to "structurally subordinate" the claims of the asbestos claimants "to the claims of the BNY Banks and Noteholders through the granting of liens . . . ." (*Comm. Br.*, pg. 2). By contrast, G–I Holdings and BMCA assert that the Securitization transaction was precipitated by a need to preserve BMCA's "liquidity strength" in the event "something happened to G–I Holdings." (*See Joint Appendix of G–I Holdings and BMCA,* Exhibit "4," *Deposition of William Collins,* dated February 27, 2001, pg. 133).

Based on its characterizations of the Pushdown and Securitization transactions as a scheme to subordinate the rights of asbestos claimants, the Committee's present concern is that if the security interests taken by BNY and the Noteholders remain unchallenged and undisturbed, these creditors will recover in full while the asbestos claimants will receive little, if any, distribution from the G–I Holdings bankruptcy estate. To the contrary, however, the Committee submits that if the assets of BMCA are divested of the liens and become part of the G–I Holdings bankruptcy estate, then BMCA's financial creditors will be on equal footing with the unsecured asbestos claimants for purposes of future distributions.

## III. Legal Discussion

### A. The Committee's Request To Act As The Estate Representative To Pursue The Proposed Avoidance Action.

As previously indicated, the Committee seeks an order from the Court authorizing it to prosecute the proposed avoidance action on behalf of the Debtor's estate. (*Comm. Br.*, pg. 19). The Committee seeks such relief because it contends that "a fundamental conflict of interest precludes [G–I Holdings] from bringing the contemplated avoidance actions." (*Comm. Br.*, pg. 20). According to the Committee, the Pushdown and Securitization transactions were consummated under the direction of executives who had, and continue to have, interests in both G–I Holdings and BMCA. (*Comm. Br.*, pg. 20). Because the individuals who orchestrated the Pushdown and Securitization transactions on behalf of G–I Holdings and BMCA remain central to both companies' operations, the Committee alleges that this conflict of interest naturally precludes them from initiating any action to potentially unwind these two transactions.

In Chapter 11 cases where no trustee is appointed, § 1107(a) of the Bankruptcy Code provides that the debtor-in-possession, and in practicality the debtor-in-possession's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. *See* 11 U.S.C. § 1107(a)(West 2004).[15] However, along with those powers comes the trustee's "fiduciary duty to maximize the value of the bankruptcy estate." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir.2003).

**15.** Section 1107(a) of the Bankruptcy Code provides in relevant part: "Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a) (West 2004).

As the Third Circuit Court of Appeals aptly recognized, "[t]his situation immediately gives rise to the proverbial problem of the fox guarding the henhouse." *Id.* In other words, if no trustee is appointed the Debtor's management bears a fiduciary duty to avoid fraudulent transfers that it itself made. *Id.* Therefore, it is reasonable to suspect that "if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it." *Id.* (citing *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir.1988)). For that reason, as the Committee notes, courts have acknowledged that the debtor-in-possession " 'often acts under the influence of conflicts of interest.' " *Id.* (citing *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir.1995)).

In situations where real or potential conflicts of interest are present, "the real losers are the unsecured creditors whose interests avoidance actions are designed to protect." *Id.* Consequently, the possibility of a derivative lawsuit by a creditor's committee "provides a critical safeguard against lax pursuit of avoidance actions." *Id.* As noted by the Third Circuit Court of Appeals, " 'nearly all courts considering the issue [of appointing a creditor's committee to act on behalf of the debtor] have permitted creditor's committees to bring actions in the name of the debtor-in-pos-

session if the committee is able to establish' that a debtor is neglecting its fiduciary duty." *Id.* at 553 (citing 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed.2003)). Where the Committee is seeking to bring an action not sponsored by the debtor-in-possession, a generally-accepted test has developed through a series of cases to determine whether an action may be maintained. 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed.2003).[16] *See also In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr.N.D.Ga.2003)("The courts that have considered the question of whether to allow a party to exercise derivative standing have crafted a variety of tests, most of which result in consideration of the same factors").

■ A committee may have derivative standing to initiate an avoidance action on behalf of the debtor where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and 4) the inaction is an abuse of discretion (*i.e.*, unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case. *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir.1995); *see also Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.)*, 183 B.R.

---

**16.** The Third Circuit Court of Appeals in its *Cybergenics* decision did not articulate the standard a committee must satisfy before given permission by a court to file an avoidance action in the debtor-in-possession's stead. However, the Third Circuit Court of Appeals did cite with approval decisions rendered on this issue by the Second and Seventh Circuit Courts of Appeals. *See Cybergenics*, 330 F.3d at 567 (citing *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96 (2d Cir.2001); *Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303 F.3d

161 (2d Cir.2002); and *Fogel v. Zell*, 221 F.3d 955 (7th Cir.2000)). *See also Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01–11353, 2003 WL 21956410, at *2 (Bankr.D.Del. 2003)("The Third Circuit's *Cybergenics* opinion does not set forth the exact procedures bankruptcy courts should follow in allowing creditors derivative standing. However, the Third Circuit stated that it agreed with recent Second and Seventh Circuit opinions addressing this issue").

795, 800 (Bankr.E.D.Tenn.1995)(stating the derivative standing test as follows: 1) the creditors' committee must assert a colorable claim; 2) the debtor must have unjustifiably refused to pursue the claim; and 3) the creditors' committee must have obtained the permission of the bankruptcy court to initiate the action on behalf of the debtor).

In *Fogel v. Zell,* the United States Court of Appeals for the Seventh Circuit stated that a creditor may obtain the permission of the bankruptcy court to bring an action in place of a trustee, and by implication a debtor-in-possession, where the debtor-in-possession "unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor." 221 F.3d 955, 965 (7th Cir.2000); *see also Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir.1985)(noting that courts have allowed creditors' committees to initiate proceedings only when the trustee or debtor-in-possession "unjustifiably failed to bring suit or abused its discretion in not suing to avoid a preferential transfer").

In *STN Enterprises,* the Second Circuit Court of Appeals provided guidance for a court to follow when deciding whether to grant derivative standing to a creditors committee. If a committee successfully presents a "colorable claim or claims for relief that on appropriate proof would support a recovery, the ... court's threshold inquiry will still not be at an end." 779 F.2d at 905. In determining whether the debtor-in-possession "unjustifiably failed to bring suit so as to give the creditor's committee standing to bring an action, the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such [a] claim[ ] is likely to benefit the reorganization estate." *Id.* In so doing, a court must focus on "a determination of probabilities of legal success and financial recovery in [the] event of success." *Id.* While a court need not undertake a "minitrial" to determine the likelihood of success in such a suit, a court "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 905–06.

■ Significantly, it is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing. The burden then shifts to the debtor-in-possession to establish, by a preponderance of the evidence, that its reason for not acting is justified. *In re Gibson Group, Inc.,* 66 F.3d at 1446. Against this background, the Court will turn to whether the Committee has satisfied the derivative standing test to prosecute the proposed avoidance action against BMCA, BNY, and the Noteholders.

**i. Has A Demand Been Made By The Committee And Rejected By The Debtor By Its Inaction To Challenge The Pushdown And Securitization Transactions.**

■ With respect to the first and second factors in the derivative standing analysis, namely, whether the creditors committee has made a demand upon the "statutorily authorized party to take action" and the authorized party has declined to do so, it is uncontested here that the Committee has never made a formal demand for G–I Holdings to initiate an avoidance action challenging the Pushdown and Securitization transactions. (*See Response of G–I Holdings and BMCA to Reply of Asbestos Claimants Committee,* pg. 10)("*Debtor's Response Br.*"). Rather, the Committee has assumed G–I Holdings will not consent to initiate such an action.

■ On its face, therefore, the Committee fails to satisfy the standard for derivative standing. However, in appropriate circumstances form should not override substance. That is, a debtor's refusal to pursue an avoidance action can be implied even where no formal demand has been made by a creditors committee. As recently articulated by the Bankruptcy Court for the Western District of Pennsylvania, "it cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required." *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),* 304 B.R. 214, 222 (Bankr.W.D.Pa.2004).

In this matter, ample evidence suggests that any formal demand made by the Committee upon G–I Holdings to investigate and prosecute the proposed avoidance action would have been refused. Significantly, since the commencement of this bankruptcy case G–I Holdings and BMCA have taken positions in opposition to the proposed attacks on the Pushdown and Securitization transactions. For example, in February of 2001 the Committee initiated an adversary proceeding seeking, *inter alia,* the substantive consolidation of BMCA into G–I Holdings. The Committee sought preliminary relief in that proceeding, "with a view to challenging the Securitization as a voidable preference under 11 U.S.C. § 547 within 90 days after the Petition Date." (*Comm. Br.,* pgs. 2–3). G–I Holdings filed opposition to the request for substantive consolidation, and filed a motion to dismiss the adversary proceeding. (*See Comm. Appx.,* Volume 1, Exhibit "14").[17] Moreover, G–I Holdings, BMCA, and BNY have all vigorously opposed the present motion, contending that

not only is the Committee's proposed avoidance action procedurally and substantively defective, but the filing of the proposed avoidance action would "materially harm" BMCA's business. (*G–I Reply Br.,* pg. 24).

Further compounding G–I Holdings' alleged unwillingness to initiate an avoidance action stems from the fact that the Pushdown and Securitization transactions were implemented by executives who still remain in charge of both G–I Holdings and BMCA. More particularly, the individual that principally drafted the reorganization agreement for the Pushdown transaction, Richard Weinberg, is not only the President of G–I Holdings, but also serves as Executive Vice President and General Counsel for BMCA. (*Comm. Br.,* pg. 20). Simply stated, G–I Holdings would be hard-pressed to initiate voluntarily an avoidance action against its subsidiary corporation, its most significant asset. Therefore, based upon the litigation posture taken by G–I Holdings in this bankruptcy proceeding, together with at least "the influence of conflicts of interest" among G–I Holdings' executives, it is reasonable for this Court to conclude that even if a formal demand by the Committee to initiate an adversary proceeding had been communicated to G–I Holdings, G–I Holdings would have most certainly denied such a request. Consequently, this Court finds that the Committee has satisfied the first and second elements for obtaining derivative standing to act on behalf of G–I Holdings.

ii. **Has The Committee Presented A Colorable Claim.**

■ Next, the Committee must successfully demonstrate that it possesses a color-

---

17. BNY also filed an objection to the Committee's adversary proceeding seeking to substantively consolidate G–I Holdings and BMCA.

able claim. The colorable claim element of the derivative standing test requires the Court to decide whether the Committee has asserted "claims for relief that on appropriate proof would support a recovery." *In re STN Enters.*, 779 F.2d at 905; *In re Tennessee Valley Steel Corp.*, 183 B.R. at 800. " 'Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.' " *In re iPCS, Inc.*, 297 B.R. at 291 (quoting *Official Comm. of Unsecured Creditors of America's Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 282 (Bankr.S.D.N.Y.1998)); *Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr.S.D.N.Y. 1999).

When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts. *Renz v. Schreiber*, 832 F.Supp. 766, 770 (D.N.J.1993)(citing *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir.1991)). A complaint should not be dismissed for failure to state a claim " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.' " *Jordan v. N.J. Dep't of Corr.*, 881 F.Supp. 947, 950 (D.N.J.1995)(quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). However, a motion to dismiss may be granted only if, after accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is still not entitled to any relief. *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183 (3d Cir.

2000), *cert. denied*, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001).

 Further, in ascertaining whether a plaintiff has stated a cognizable claim, the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses. *Griesenbeck v. Am. Tobacco Co.*, 897 F.Supp. 815, 820 (D.N.J. 1995). A complaint may be subject to dismissal for the failure to state a legally cognizable claim when an affirmative defense appears on its face. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Although a motion to dismiss normally invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *Brooks v. City of Winston–Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citation omitted); *see generally* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1990)("A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate). Finally, in the bankruptcy context, if the claim lacks "any merit whatsoever, allowing another party to pursue the claims at the expense of the bankruptcy estate would neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceedings." *In re iPCS, Inc.*, 297 B.R. at 291.

### a. The 1994 Pushdown Transaction

As previously noted, the Committee first seeks to avoid the 1994 Pushdown transaction as a fraudulent conveyance pursuant to § 544(b) of the Bankruptcy Code and the Uniform Fraudulent Transfer Act

("UFTA"), codified in the State of New Jersey at N.J.S.A. 25:2–20 to –34. Specifically, the Committee proposes to file a fraudulent transfer action against BMCA as an initial transferee under 11 U.S.C. § 550(a)(1) based on theories of actual and constructive fraud, and intends to also join the BNY Banks and the Noteholders as "mediate or immediate transferees" under 11 U.S.C. § 550(a)(2) "on the theory that the Securitization constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown." (*Comm. Br.*, pg. 6). In opposition, G–I Holdings, BMCA and BNY argue, *inter alia*, that the applicable statute of limitations period for such claims has expired.

Section 544(b)(1) of the Bankruptcy Code provides in part as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

[11 U.S.C. § 544(b)(1)(West 2004).]

■ The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away. *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir.2000)(citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237 (3d Cir.2000)). "When recovery is sought pursuant to § 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer." *Id.* at 250.

■ Under § 544(b), the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who can avoid the transfer or obligation under applicable state law. 5 COLLIER ON BANKRUPTCY ¶ 544.09[1] (15th ed. rev.2003); *see also Forman v. Jeffrey Matthews Fin. Group, LLC (In re Halpert & Co.)*, 254 B.R. 104, 122 (Bankr.D.N.J.1999)("Section 544(b) grants the trustee the same rights as any unsecured creditor to avoid transfers under applicable state law"); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 601 (8th Cir. BAP 2003)("Section 544(b) of the Bankruptcy Code gives the bankruptcy trustee whatever avoiding powers an unsecured creditor with an allowable claim might have under applicable state or federal law") (citation omitted). The avoidance power provided in § 544(b) is "distinct from others because a trustee or debtor-in-possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir.2000), *vacated on other grounds*, 310 F.3d 785 (3d Cir.2002).

■ In order to prevail under the § 544(b) avoiding power, a trustee must demonstrate the existence of an actual creditor holding an allowable unsecured claim who could avoid the challenged transfer under the applicable state or federal law. *In re DLC, Ltd.*, 295 B.R. at 601–02. *See also Panama Williams, Inc. v. Parr (In re Panama Williams, Inc.)*, 211 B.R. 868, 871–72 (Bankr.S.D.Tex.1997)(noting that under § 544(b) the trustee must locate an existing unsecured creditor of the debtor who, on the date of bankruptcy, is able to avoid a transfer of property). The trustee or

debtor-in-possession bears the burden of proving the existence of a qualified unsecured creditor. *In re DLC, Ltd.,* 295 B.R. at 602. If the trustee or debtor-in-possession can find such an unsecured creditor, the trustee or debtor-in-possession assumes those rights. *In re Panama Williams, Inc.,* 211 B.R. at 872. Significantly, to invoke § 544(b), the trustee or debtor-in-possession must show that at least one of the present unsecured creditors holds an allowable claim against whom the transfer or obligation was invalid. *Young v. Paramount Communications, Inc. (In re Wingspread Corp.),* 178 B.R. 938, 945 (Bankr.S.D.N.Y.1995)(citing 5 COLLIER ON BANKRUPTCY ¶ 544.03[1] (15th ed.1994)); *Moore v. Bay (In re Estate of Sassard & Kimball, Inc.),* 284 U.S. 4, 5, 52 S.Ct. 3, 4, 76 L.Ed. 133 (1931).

 Furthermore, the rights of the trustee or debtor-in-possession to avoid a transfer are "completely derivative of those of an actual unsecured creditor." *Id.* That is, § 544(b) confers upon the trustee or debtor-in-possession "no greater rights of avoidance than the creditor would have if it were asserting invalidity on its own behalf." 5 COLLIER ON BANKRUPTCY ¶ 544.09[3] (15th rev.ed.2003). If the creditor is "deemed estopped to recover upon a claim, or is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee [or debtor-in-possession] is likewise estopped or barred." *Id.* The overall effect of § 544(b), then, "is to clothe the trustee [or debtor-in-possession] with no new or additional rights ... over that possessed by a creditor, but simply puts [the trustee or debtor-in-possession] in the shoes of the latter, and subject to the same limitations and disabilities that

would have beset the creditor in the prosecution of the action on [its] own behalf." *Id.* (citing *Davis v. Willey,* 263 F. 588, 589 (N.D.Cal.1920), *aff'd,* 273 F. 397 (9th Cir. 1921)). *See also First Union Nat'l Bank v. Gibbons (In re Princeton–New York Investors, Inc.),* 219 B.R. 55, 61 (D.N.J. 1998).

Based on the foregoing principles, in order for the Committee to have a colorable claim to avoid the Pushdown transaction under § 544(b) of the Code, it must identify an existing unsecured creditor with an allowable claim who could avoid the transfer of G–I Holdings' roofing business under the New Jersey UFTA.

N.J.S.A. 25:2–25 provides the fundamental principles for fraudulent transfers under New Jersey law:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.
>
> [N.J.S.A. 25:2–25 (1997).] [18]

18. N.J.S.A. 25:2–25a is premised on "actual" fraud while N.J.S.A. 25:2–25b is based on the concept of "constructive" fraud.

Further, N.J.S.A. 25:2–27(a) provides an additional avenue for avoiding fraudulent transfers under New Jersey law as to present creditors. N.J.S.A. 25:2–27a provides as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

[N.J.S.A. 25:2–27(a) (1997).]

Significantly, N.J.S.A. 25:2–31 contains the statute of limitations periods for avoiding fraudulent transfer actions under the New Jersey UFTA. This section provides in relevant part:

A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:

a. Under subsection [25:2–25a], within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;

b. Under subsection [25:2–25b] or subsection [25:2–27a], within four years after the transfer was made or the obligation was incurred[.]

[N.J.S.A. 25:2–31 (2002).]

In support of its motion to file a claim to avoid the Pushdown transaction, the Committee presents various theories on why this proposed action is not time-barred as argued by G–I Holdings, BMCA, and BNY. As stated by the Committee, the proposed avoidance action with respect to the Pushdown transaction remains timely based on the following theories: (i) a "ten-year statute of limitations available to certain of G–I [Holdings'] environmental creditors, whose avoidance rights the estate representative may enforce for the benefit of the estate as a whole"; (ii) the "discovery rule available to asbestos claimants whose illnesses did not become manifest until well after the Pushdown"; (iii) "express tolling of the statute on the part of BMCA"; and (iv) equitable tolling of the statute of limitations "by reason of a series of stays, restraining orders, and injunctions." (*Comm. Br.*, pgs. 17–18).

The Pushdown transaction occurred on or about January 31, 1994. Accordingly, under N.J.S.A. 25:2–25b or N.J.S.A. 25:2–27a, any challenge to the Pushdown transaction based on "constructive fraud" needed to be filed prior to February of 1998, or within four years "after the transfer was made or the obligation was incurred." *See* N.J.S.A. 25:2–31b (2002). Moreover, unless the "discovery rule" contained within N.J.S.A. 25:2–31a applies, any claim for an "actual" fraudulent transfer under N.J.S.A. 25:2–25a needed to also be filed prior to February of 1998, or within four years "after the transfer was made or the obligation was incurred". *See* N.J.S.A. 25:2–31a (2002). Consequently, unless the "discovery rule" of N.J.S.A. 25:2–25a applies or one of the Committee's alleged tolling theories applies, the Committee's proposed fraudulent transfer action under § 544(b) of the Code to avoid the Pushdown transaction would be time-barred. Each of the Committee's tolling theories will be addressed in turn.

(i) **The Applicability Of A Ten-Year Statute Of Limitations Period**

■ The Committee first submits that its proposed New Jersey UFTA action challenging the Pushdown transaction is

timely because "the ten-year statute of limitations available to the New Jersey Department of Environmental Protection [hereinafter the 'NJDEP'] operates in favor of the Estate Representative." (*Comm. Br.*, pg. 53)(citing N.J.S.A. 2A:14–1.2 (2001)).[19] For the following reasons, this theory is appropriate for the Committee to pursue at this time by filing an adversary complaint for either constructive fraud or actual fraud, or both, under the New Jersey UFTA.[20]

Schedule F to the Summary of Schedules filed by G–I Holdings is captioned, "Creditors Holding Unsecured Nonpriority Claims." Attachment F–I to Schedule F lists a multitude of claims "arising from environmental and asbestos liabilities." Attachment F–I lists approximately twenty–seven (27) separate contingent, unliquidated and disputed claims with respect to the NJDEP.[21]

Section 1111(a) of the Bankruptcy Code regulates the claims process in Chapter 11 cases. Section 1111(a) provides as follows:

A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) or 1106(a)(2) of this title, *except a claim or interest that is scheduled as disputed, contingent, or unliquidated.*

[11 U.S.C. § 1111(a)(West 2004)(emphasis added).]

Thus, a claim listed on a debtor's schedules is deemed filed under § 501 unless the claim is scheduled as disputed, contingent or unliquidated. *See* 11 U.S.C. § 1111(a)(West 2004); *ITT Commercial Fin. Corp. v. Dilkes (In re Analytical Sys., Inc.)*, 933 F.2d 939, 941 (11th Cir.1991). If a particular claim is listed as disputed, contingent, or unliquidated, it becomes the "creditor's responsibility to verify the accuracy of [its] claim as listed on the debtor's schedules, ... and a creditor whose claim is not scheduled, scheduled improperly or scheduled as disputed, contingent or unliquidated must file a proof of claim with the bankruptcy court within the time fixed by that court." *Id.* at 941–42. *See also In re Laclede Cab Co.*, 186 B.R. 688, 690 (Bankr.E.D.Mo.1995); *In re 1880 Superfine Lane, Inc.*, 122 B.R. 665, 667 (Bankr.D.Del.1990).

In this instance, although G–I Holdings included the NJDEP as an unsecured creditor in Schedule F, it qualified its status by listing the claim as "contingent, unliquidated, and disputed." Therefore, by operation of § 1111(a) of the Code, G–I Holdings' inclusion of the NJDEP in Schedule F does not render any possible claim of the NJDEP as "filed" pursuant to § 501 of the Bankruptcy Code.[22] Under

---

**19.** N.J.S.A. 2A:14–1.2a provides as follows: "Except where a limitations provision expressly and specifically applies to actions commenced by the State or where a longer limitations period would otherwise apply, and subject to any statutory provisions or common law rules extending limitations periods, any civil action commenced by the State shall be commenced within ten years next after the cause of action shall have accrued." N.J.S.A. 2A:14–1.2 (2001).

**20.** As the Debtor and BMCA are both headquartered in New Jersey, and a substantial portion of the property transferred and encumbered in the Pushdown and Securitiza-

tion transactions is located in New Jersey, the Committee suggests the New Jersey UFTA is the applicable state fraudulent conveyance law that applies to this case. G–I Holdings, BMCA, and BNY do not contest this assumption.

**21.** The twenty-seven separate claims arise from possible environmental contamination at approximately twenty-six different environmental sites.

**22.** Section 501(a) of the Bankruptcy Code provides as follows: "A creditor or an indenture trustee may file a proof of claim. An

normal circumstances, the effect of this would prevent the NJDEP from having an "allowable" claim in accordance with § 502(a) of the Code. In turn, § 502(a) of the Code provides in relevant part: "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a)(West 2004).

Because the NJDEP currently does not have a "filed" claim under §§ 1111(a) and 501(a), it ordinarily would not have an allowable claim under § 502(a) of the Code at this time. However, the complexity and voluminousity of this particular bankruptcy case presents the Court with a unique situation, one that requires a different result. Because a bar date has not yet been fixed by the Court with respect to the filing of proofs of claims, the NJDEP still has the ability to file a proof of claim pursuant to § 501 of the Code. Although any claim filed by the NJDEP would be the subject of review for any potential claims challenge, the NJDEP is an existing unsecured creditor of G–I Holdings with a potential allowable claim whose position the Committee can assume for purposes of challenging the Pushdown transaction under N.J.S.A. 25:2–25 or N.J.S.A. 25:2–27a, or both (based on actual fraud or constructive fraud). As such, the Court will permit the Committee to "step into the shoes" of the NJDEP for purposes of § 544(b), and take advantage of the ten-year statute of limitations period for asserting fraudulent transfer actions made applicable to the NJDEP by the New Jersey Supreme Court in *State of N.J. Dep't of Envtl. Prot. v. Caldeira*, 171 N.J. 404, 794 A.2d 156 (2002). Consequently, the Committee is permitted to file a fraudulent transfer action on behalf of the NJDEP for the benefit of all unsecured creditors pursuant to § 544(b) of the Code.

equity security holder may file a proof of

### (ii) The "Discovery Rule" Embodied Within N.J.S.A. 25:2–25a

The second theory advanced by the Committee in asserting the applicable statute of limitations does not bar a fraudulent transfer action to unwind the Pushdown transaction is that the " 'discovery rule' embodied in the New Jersey UFTA operates in favor of asbestos victims whose diseases did not become manifest until one year before G–I [Holdings] filed its bankruptcy petition." (*Comm. Br.*, pg. 54). More specifically, the Committee submits that the

> one-year discovery rule applicable under New Jersey's UFTA means that claims to avoid the Pushdown as intended to hinder, delay, and defraud asbestos victims remain timely in respect of any tort claimant whose asbestos injuries were not diagnosed sooner than one year before January 5, 2001, which is both the Petition Date and the effective date of BMCA's voluntary tolling.

[ (*Comm. Br.*, pg. 55).]

As previously noted, N.J.S.A. 25:2–31a provides that any claim to avoid a transfer with actual intent to hinder, delay, or defraud any creditor of the debtor must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant." N.J.S.A. 25:2–31a (2002). Because more than four years have elapsed since the transfer of G–I Holdings' roofing business occurred, the Committee must invoke the "discovery rule" to satisfy the limitations period. In support of its argument, the Committee principally relies upon a decision rendered by the United States District Court for the Southern District of New York, *Lippe v.*

interest." 11 U.S.C. § 501(a)(West 2004).

*Bairnco Corp.*, 225 B.R. 846 (S.D.N.Y. 1998), *on reargument*, 229 B.R. 598 (S.D.N.Y.1999), *aff'd*, 2004 WL 765061 (2d Cir.2004). G–I Holdings, BMCA, and BNY maintain the Committee cannot rely on the discovery rule contained within N.J.S.A. 25:2–31a because "the Committee has failed to identify a single claimant holding an allowable claim who could take advantage of the discovery rule as required to bring an action under section 544(b) of the Bankruptcy Code." (*Debtor's Response Br.*, pg. 17).

This Court finds the reasoning and rationale of *Lippe* to be persuasive.[23] The facts of *Lippe* are as follows. In 1968, Keene Corporation (hereinafter "Keene") entered the asbestos products business by acquiring a company that manufactured and distributed insulation and other materials containing asbestos. *Lippe v. Bairnco Corp.*, 218 B.R. 294, 296 (S.D.N.Y.1998). In the late 1970's, asbestos-related illnesses started to appear, and claims by individuals exposed to asbestos were filed against Keene in rapidly increasing numbers. *Id.* at 297. By December, 1989, more than 70,000 asbestos claims were pending against Keene. *Id.* When Keene decided to file for bankruptcy in December, 1993, the Company was a defendant in approximately 101,000 lawsuits involving asbestos-related property damage, personal injury, and wrongful death claims. *Id.*

As the number of asbestos-related lawsuits filed against Keene in the 1980's continued to rise, it engaged in a series of transactions. *Id.* "First, it created a holding company. Second, it transferred five profitable divisions to newly-created subsidiaries of the holding company." *Id.* The trustees of the "Keene Creditors Trust" (hereinafter the "Plaintiffs") instituted an adversary proceeding, alleging that the transfers "were fraudulent conveyances made solely for the purpose of placing hundreds of millions of dollars in assets beyond the reach of Keene's creditors." *Id.* The adversary proceeding was filed on behalf of Keene's estate as well as present and future victims of asbestos exposure. *Id.*[24] In their complaint, all of the Plaintiffs' fraudulent conveyance causes of action were brought pursuant to § 544(b) of the Bankruptcy Code and New York state fraudulent conveyance law. *Lippe*, 225 B.R. at 851.

More particularly, the Plaintiffs instituted a claim for actual fraud pursuant to New York Debtor and Creditor Law § 276.[25] *Id.* at 852–53. In turn, § 276 is governed by either the limitation period of

---

**23.** Until the New Jersey Supreme Court's decision in *SASCO 1997 NI, LLC v. Zudkewich*, 166 N.J. 579, 594, 767 A.2d 469 (2001), no New Jersey court decision had addressed the one-year tolling provision contained in N.J.S.A. 25:2–31. Since the *Zudkewich* decision, the New Jersey state courts have not revisited the one-year tolling provision, particularly in factual circumstances presented in this matter where a debtor potentially has a multitude of tort creditors, some of whom have possibly not yet manifested injuries related to exposure to asbestos.

**24.** The Official Committee of Unsecured Creditors of Keene filed the original complaint in 1995. Plaintiffs Richard A. Lippe, Archie R. Dykes, and John Robbins comprised the trustees for the Keene Creditors Trust, which was established by order of the bankruptcy court and a consensual plan of reorganization. The plan transferred from the Committee to the Keene Creditors Trust whatever right the Committee had to prosecute the avoidance action. 218 B.R. at 298.

**25.** Section 276 of the New York Debtor and Creditor Law provides as follows: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. DEBTOR AND CREDITOR LAW § 276 (2001).

six years from the date of the alleged fraud or two years from the date of discovery, whichever is later. *Id.* at 853.[26] Because Keene filed for bankruptcy on December 3, 1993, in order to invoke the two-year discovery rule the Plaintiffs needed to demonstrate the existence of an unsecured creditor who did not discover the alleged actual fraud prior to December 3, 1991. *Id.* at 853.

The various defendants to the fraudulent conveyance action argued that the Plaintiffs failed to prove the existence of at least one actual creditor who had standing under § 544(b) to avoid the transactions. *Id.* By contrast, the Plaintiffs argued that the class of claimants "recently diagnosed with asbestos-related diseases" provided it "with standing to pursue the fraudulent conveyance causes of action in this case, and whose claims [were] either immune from or toll the running of the statute of limitations." *Id.* The Plaintiffs argued "that individuals who were exposed to asbestos, but who were unaware of any asbestos-related injury, could not have discovered the corporate defendants' 'fraud.' " *Id.* at 854. Thus, the Plaintiffs argued, "these claimants possess[ed] timely claims against all the corporate defendants for actual fraud *provided that they did not become*

*aware of any asbestos injury, and hence the corporate defendants' fraud, until the two-year period preceding Keene's bankruptcy filing.*" *Id.* (emphasis added). As the district court concurred, the statute of limitations will not bar an action "unless it conclusively appears that the plaintiff had knowledge of facts from which the alleged fraud might be reasonably inferred." *Id.* at 854–55 (citation omitted).

In opposing the Plaintiffs' position, the corporate defendants contended that since the transactions "were fully disclosed and matters of public record by 1990 at the very latest," any actual fraud claim based on these transactions had expired in 1992, a year before Keene filed for bankruptcy. *Id.* at 855. Further, the corporate defendants maintained that because the transactions were disclosed, this " 'would suggest to a person of ordinary intelligence the probability that he [or she] has been defrauded.' " *Id.* (citing *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983)). In other words, the corporate defendants believed the publicizing of the transactions in 1990 imputed notice of possible fraudulent conduct to individuals exposed to asbestos who had not yet begun manifesting symptoms.

---

**26.** The six-year limitations period is governed by New York Civil Practice Law and Rules § 213(8) which states: "The following actions must be commenced within six years: an action based upon fraud; the time within which the action must be commenced shall be computed from the time the plaintiff or the person under whom he [or she] claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8) (2003). In turn, New York Civil Practice Law and Rules § 203(g) modifies § 213(8) by providing a two-year limitations period from the date of discovery. Section 203(g) provides in relevant part: "[W]here the time within which an action must be commenced is computed from the time when facts were discovered or from the time when

facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer." N.Y. C.P.L.R. § 203(g) (2003). Based upon the operation of §§ 213(8) and 203(g), the courts of New York hold that a cause of action based upon actual fraud must be commenced within six years of the commission of the fraud, or two years from the date the fraud could reasonably have been discovered, whichever is later. *Lefkowitz v. Appelbaum,* 258 A.D.2d 563, 685 N.Y.S.2d 460, 461 (N.Y.App.Div.1999) (citation omitted).

The district court disagreed with the analysis set forth by the corporate defendants. The court reasoned the "claimants identified by [the][P]laintiffs could not possibly have been on notice of any alleged fraud or loss if they had no reason to know that they were afflicted with an asbestos-related injury. These individuals could not have known that they had been injured at all until their injuries started to manifest themselves." *Id.* Based on this reasoning, the district court held:

[A]sbestos-victim claimants who were unaware of any asbestos injury prior to two years before Keene filed for bankruptcy are not barred from asserting an actual fraud claim against any of the corporate defendants because the actual fraud claim is not timebarred. This category of claimants can be considered "actual creditors" pursuant to § 544(b) and they can attack any of the [t]ransactions pursuant to [New York Debtor and Creditor Law § 276].

[*Id.*]

In a subsequent opinion addressing the corporate defendants' motion for reconsideration, the district court affirmed and clarified its prior holding with respect to the ability of recently diagnosed asbestos claimants to file a fraudulent transfer action under § 544(b) and New York Debtor and Creditor Law § 276. *See generally*, *Lippe v. Bairnco Corp.*, 229 B.R. 598 (S.D.N.Y.1999), *aff'd*, 2004 WL 765061 (2d Cir.2004). The district court noted that "the question is not when the fraud claim accrued but when [the][P]laintiffs, through the exercise of reasonable diligence, should have discovered the fraud." *Id.* at 603. Further, the court concluded the recently diagnosed asbestos claimants "had no reason to know years earlier that they had been defrauded by transactions to which they were not a party and in which they had no conceivable interest at a time when they had no knowledge (actual or constructive) that they had suffered any injury." *Id.*

The posture of the *Lippe* decision is analogous to the matter presently before this Court.[27] Given the virtually tens of

27. Subsequent to the March 29, 2004 oral argument, the parties submitted a series of letters to the Court with respect to another decision in the Keene bankruptcy case, *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357 (S.D.N.Y. 2003), *aff'd*, 2004 WL 765061 (2d Cir.2004). Regarding this decision, the Court received the following submissions: 1) an April 14, 2004 letter from Martin J. Bienenstock, Esq., counsel for G–I Holdings and BMCA; 2) an April 22, 2004 letter from David R. Gross, Esq., co-counsel for the Legal Representative of Present and Future Holders of Asbestos-related Demands; 3) an April 22, 2004 letter from Trevor W. Swett, Esq., co-counsel for the Committee; 4) an April 23, 2004 letter from Mr. Bienenstock; and 5) an April 29, 2004 letter from Mr. Bienenstock. The initial letter submitted by Mr. Bienenstock cites the recent *Lippe* decision for the proposition that a plaintiff must prove damages or injury in conjunction with an actual fraud claim. *See Lippe*, 249 F.Supp.2d at 375 ("Unless the conveyance diminishes the value [of] the debtor's estate, the claimant has 'no pecuniary harm ... or right of objection ... since the assets of the transferor are no less after the questioned transfer was made than before'") (citation omitted). Here, Mr. Bienenstock claims that no damage to G–I Holdings' creditors can be shown "because G–I [Holdings] retained 100% of the stock of BMCA and thereby retained its full value." Despite Mr. Bienenstock's contention, his reference to the 2003 *Lippe* decision does not affect the decision rendered by the Court today. As the Committee aptly notes, whether "fair value" was exchanged between G–I Holdings and BMCA in the Pushdown transaction, such that G–I Holdings' creditors suffered no harm, may very well be a legitimate matter of contention once the permitted avoidance action is filed. But as the Committee states, and this Court agrees, "it is a dispute that warrants and indeed requires litigation." Therefore, resolving the issue of whether "fair value" was exchanged, and thus its implication for a

thousands of asbestos-related lawsuits filed against G–I Holdings, with many more contemplated, it is reasonable to expect that it is possible that at least one claimant exists who was unaware of any asbestos-related injury prior to one year before G–I Holdings filed for bankruptcy. *See Lippe*, 225 B.R. at 855. Like the recently diagnosed asbestos claimants in *Lippe*, any party that recently discovered an asbestos-related injury due to the conduct of G–I Holdings possesses a timely claim against BMCA so long as the party did not become aware of any asbestos–related injury, and hence the alleged fraudulent conduct, until the one-year period preceding G–I Holdings' bankruptcy filing. *Id.* at 854. If so, the express tolling provision agreed to by the parties and contained within the Order granting the Preliminary Injunction would not bar any fraudulent transfer action from being filed at this time. Moreover, any party that recently discovered an asbestos-related injury could not possibly have been on notice of any alleged fraud if they had no reason to know that they were affected with an asbestos-related injury. More specifically, any recent claimant had no reason to know that he or she had been allegedly defrauded when G–I Holdings transferred its roofing business to BMCA in 1994, significantly, at a time when he or she had no reason to suspect any asbestos-related injury. *See Lippe*, 229 B.R. at 603.

■ As the district court recognized in *Lippe*, the statute of limitations will not bar an action "unless it conclusively appears that the plaintiff had knowledge of facts from which the alleged *fraud* might be reasonably inferred." *Id.* at 854–55. *Cf. Intili v. DiGiorgio*, 300 N.J.Super. 652, 660–61, 693 A.2d 573 (Ch.Div.1997)(holding that a plaintiff could not utilize the one-year discovery provision contained within N.J.S.A. 25:2–31a where the plaintiff had

both record notice and actual notice of the transfer, but did not file suit until after the four-year statutory period had expired).

G–I Holdings and BMCA are correct to note that the Committee has not filed a proposed complaint in conjunction with its motion. Instead, it filed a "Summary of Claims to be Asserted by Official Committee of Asbestos Claimants in Proposed Action for the Benefit of the G–I Estate." (*See Comm. Appx.*, Vol. 2, Exhibit "32"). However, the Committee included the following qualification: "[t]his Summary of Claims is for illustrative purposes only, and is not intended as a definitive statement of the allegations, contentions, or causes of action that may be alleged in a Complaint should the Court grant leave for the Committee to proceed with the proposed action." (*See Comm. Appx.*, Vol. 2, Exhibit "32"). Moreover, in its moving and reply papers the Committee did not identify a specific unsecured creditor who manifested an asbestos-related injury within one year prior to the filing of G–I Holdings' bankruptcy petition. However, it is certainly possible that the Committee can assert a fraudulent transfer claim pursuant to N.J.S.A. 25:2–25a that on appropriate proof would support a recovery by simply identifying a qualifying asbestos-related claimant. *In re STN Enters.*, 779 F.2d at 905.

■ As recognized by the New Jersey Supreme Court, " 'fraudulent intent, by its very nature, is rarely susceptible to direct proof....' " *Gilchinsky v. Nat'l Westminster Bank*, 159 N.J. 463, 477, 732 A.2d 482 (1999)(quoting *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17, 21 (N.Y.App.Div.1986), *appeal dismissed*, 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987)). Because a defendant will ordinarily not acknowledge that he or

cause of action based on actual fraud, is not for the Court to resolve at this time.

she transferred funds to place them beyond the reach of creditors, "actual intent often must be established through inferential reasoning, deduced from the circumstances surrounding the allegedly fraudulent act." 159 N.J. at 477, 732 A.2d 482 (citations omitted).

█ In determining whether the circumstances of a particular transaction give rise to the conclusion that the transferor "intended to thwart or evade creditors, courts generally look to factors commonly referred to as 'badges of fraud.'" *Id.* at 476, 732 A.2d 482. These badges of fraud "represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent." *Id.* (citing *Hassett v. Goetzmann,* 10 F.Supp.2d 181, 188 (N.D.N.Y.1998)). N.J.S.A. 25:2–26 lists the badges of fraud that New Jersey courts are to consider in determining whether a debtor conveyed property with the actual intent to place it beyond the reach of creditors. 159 N.J. at 476, 732 A.2d 482.

Pursuant to N.J.S.A. 25:2–26, consideration is given to the following factors in establishing actual intent: 1) the transfer or obligation was to an insider; 2) the debtor retained possession or control of the property transferred after the transfer; 3) the transfer or obligation was disclosed or concealed; 4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; 5) the transfer was of substantially all the debtor's assets; 6) the debtor absconded; 7) the debtor removed or concealed assets; 8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; 9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; 10) the transfer occurred

shortly before or shortly after a substantial debt was incurred; and 11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. N.J.S.A. 25:2–26 (1997).

█ In determining actual intent to defraud creditors, courts should balance the factors enumerated in N.J.S.A. 25:2–26, as well as any other factors relevant to the challenged transaction. 159 N.J. at 477, 732 A.2d 482. As stated by the New Jersey Supreme Court:

> [t]he proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.
>
> [*Id.* (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254–55 (1st Cir.1991)).]

In support of its motion seeking to file an adversary complaint, the Committee contends that several badges of fraud are present with respect to the Pushdown transaction. According to the Committee: 1) the transfer was made to an insider, or a person in the control of G–I Holdings; 2) G–I Holdings retained indirect control of the property transferred after the transfer; 3) before the transfer of assets was made, G–I Holdings had been sued in thousands of asbestos personal injury and wrongful death actions; 4) the transfer encompassed substantially all of G–I Holdings' assets; 5) "BMCA's limited assumption of $204 million of asbestos liability was not reasonably equivalent to the value of the assets transferred"; 6) G–I Holdings was insolvent "or, at the very least, at serious risk of insolvency" when the Pushdown transaction occurred; and 7) "the

Pushdown was engineered with a view to BMCA[] taking on substantial financial obligations." (*Comm. Br.*, pgs. 25–26).

In contrast to the position of the Committee, G–I Holdings and BMCA submit that no badges of fraud exist in connection with the Pushdown transaction based on the following: 1) G–I Holdings retained all of the value of the transferred property; 2) G–I Holdings did not retain possession or control over the transferred property, "as BMCA is a separate corporate entity with its own management team-G–I Holdings owns the stock of BMCA, not the assets"; 3) G–I Holdings widely disclosed and publicized the Pushdown transaction; 4) G–I Holdings "did not abscond or make itself otherwise unavailable to process"; 5) G–I Holdings has not removed or concealed any assets; 6) "the value of the consideration given in the [Pushdown] transaction was more than 'reasonably equivalent,' since G–I Holdings retained all of the value of the transferred property, plus BMCA's assumption of $204 million of asbestos liability"; 7) G–I Holdings was not insolvent at the time of the Pushdown transaction because it owned the stock of BMCA, "the value of which greatly exceeds the amount of potential claims against the estate"; 8) the Pushdown transaction did not occur shortly before or shortly after G–I Holdings incurred substantial debt; and 9) G–I Holdings did not transfer its assets to a lienor, who then transferred such assets back to an insider. (*Debtor's Response Br.*, pgs. 19–20).

As to its constructive fraud claim, the Committee asserts that such a claim depends in large part upon a showing that the transferor did not receive equivalent value in exchange for the transfer in question and that it was left insolvent or was about to incur excessive debt in relation to its capital or its ability to generate cash. (*Comm. Br.*, pg. 26). The Committee sub-

mits that G–I Holdings received less than reasonably equivalent value in exchange for its transfer of the roofing business as evident in the terms of the Reorganization Agreement itself, pursuant to which BMCA received substantially all of the operating assets of the roofing business but contractually assumed only a portion of its related liabilities. (*Comm. Br.*, pg. 26). The Committee argues that BMCA ostensibly limited its responsibility to paying only the first $204 million of GAF's asbestos liabilities, even though G–I Holdings bears unlimited responsibility for the asbestos torts of GAF and even though it is alleged the corporate group foresaw that asbestos liabilities would vastly exceed BMCA's purported limited share. The Committee further asserts that the Pushdown left the Debtor "deeply insolvent". (*Comm. Br.*, pgs. 26–27).

In contrast to the Committee's position, G–I Holdings and BMCA submit that G–I Holdings, by definition, received reasonably equivalent value in the 1994 Pushdown because G–I Holdings received all of the stock of BMCA and BMCA's assumption of $204 million in G–I Holdings' liabilities does not change this fact. (*Debtor's Response Br.*, pg. 21). In fact, G–I Holdings and BMCA submit that the 1994 Pushdoen left G–I Holdings in a better position than before because G–I Holdings' value increased since the separation benefited BMCA and G–I Holdings. (*Debtor's Response Br.*, pg. 24). Additionally, as noted above, G–I Holdings and BMCA submit that G–I Holdings was not insolvent at the time of the Pushdown transaction because it owned the stock of BMCA, the value of which exceeds the amount of potential claims against the estate. (*Debtor's Response Br.*, pgs. 19–20). Simply put, the parties obviously disagree as to the characterization of and motivation behind the Pushdown transaction. In determining whether the Committee has dem-

onstrated a colorable claim, this Court must accept as true the allegations raised by the Committee and all reasonable inferences derived from those facts. *See Schreiber,* 832 F.Supp. at 770. Doing so, the Committee's allegations would survive a motion to dismiss. Therefore, this Court cannot affirmatively state beyond doubt that the Committee can prove no set of facts in support of its proposed fraudulent transfer claim based on actual intent to hinder, delay or defraud creditors or based on constructive fraud that would entitle the Committee to the relief it seeks. *See Jordan,* 881 F.Supp. at 950.

The next inquiry in the derivative standing analysis is whether G–I Holdings' inaction in pursuing a cause of action challenging the Pushdown transaction constitutes an "unjustifiable" refusal. *See Cybergenics,* 330 F.3d at 566–67. In determining whether a debtor unjustifiably refuses to pursue a particular action, courts consider the following factors: 1) whether conflicts of interest exist between the debtor and the parties against whom the creditors' committee's derivative action will be brought; 2) whether the creditor's interests are protected despite the debtor's refusal; 3) whether allowing the creditors' committee to pursue the action on the debtor's behalf will benefit the estate; and 4) whether appointing a trustee and allowing the trustee, as opposed to the creditors' committee, to pursue the action or converting the Chapter 11 case to a Chapter 7 case would be more beneficial to the estate. *In re Tennessee Valley Steel Corp.,* 183 B.R. at 806 (citing *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 248–52 (5th Cir.1988)).

Considering these factors, the Court concludes that G–I Holdings' inaction in instituting an adversary proceeding challenging the Pushdown transaction as a fraudulent transfer premised on actual fraud or constructive fraud is unjustified. G–I Holdings is operating under at least the influence of conflicts of interest, and it is perfectly reasonable to assume that this dynamic is, to some degree, influencing its decision-making process as a debtor-in-possession. As previously noted, G–I Holdings would be hard-pressed to voluntarily initiate an adversary proceeding detrimental to BMCA, its most significant asset, and seek to unwind a transaction implemented by the very same executives who still remain in control of both G–I Holdings and BMCA. Further, the interests of the asbestos claimants are not properly protected despite G–I Holdings imputed refusal to bring suit. If no challenge to the Pushdown transaction occurs, the Committee argues that it will have lost the opportunity to recapture significant value for the benefit of G–I Holdings' pool of unsecured creditors. The loss of this value will undoubtedly and significantly reduce any recovery the unsecured creditors (most prominently the asbestos claimants) might realize in the future. Therefore, the Court finds that G–I Holdings has unjustifiably refused to bring suit challenging the Pushdown transaction a fraudulent conveyance based on actual and constructive fraud. Consequently, this Court will grant the Committee leave to file a fraudulent transfer action challenging the 1994 Pushdown transaction on behalf of G–I Holdings pursuant to § 544(b) of the Code.

As previously indicated, with respect to the Pushdown transaction the Committee also intends to join the BNY Banks and the Noteholders as "mediate or immediate transferees" under § 550(a)(2) of the Code "on the theory that the Securitization constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown." (*Comm. Br.,* 6). The Committee contends "that because the property transferred

pursuant to the Pushdown represented nearly all of [ ] GAF's business operations, by definition, the property held by BMCA at the time of the Securitization was the same." (*Reply Brief on Behalf of the Committee,* pg. 27)(hereinafter "*Comm. Reply Br.*"). More specifically, the Committee avers that "a comparison of the assets transferred in the Pushdown to the assets upon which the liens were granted in the Securitization[ ] discloses that many of the exact same assets, including manufacturing plants, equipment, and intellectual property, were involved in both of these transfers." (*Comm. Reply Br.* pg. 27).

In contrast to the Committee, BNY asserts the property subject to the Securitization transaction was simply not the same property as that transferred in the Pushdown transaction. (*Brief on behalf of the Bank of New York,* pg. 13)(hereinafter "*BNY Br.*"). In support of this argument both BNY, G–I Holdings and BMCA note that almost seven years elapsed between the 1994 Pushdown transaction and the 2000 Securitization transaction. (*BNY Br.,* pg. 13); (*Debtor's Response Br.,* pg. 22). As BNY submits:

> Almost seven years elapsed between the 1994 [Pushdown] [t]ransaction and the December 2000 [Securitization] transaction. The assets involved in the two transactions are not the same. During those seven years BMCA operated as a separate business from G–I [Holdings], obtained hundreds of millions of dollars in financing and became highly profitable and successful. It turned over its inventory and collected its receivables and generated new receivables scores of times. It also made its own acquisitions of other companies. In short, its assets in December 2000 were separate and distinct from those that were the subject of the 1994 [Pushdown] and the [Securitization] [was] not on the same property that was the subject of the [Pushdown].

[ (*BNY Br.,* pg. 13).]

As BNY continues:

> Another fatal defect in the Committee's proposed fraudulent conveyance action is the fact that it cannot be seriously argued that the 1994 Transaction and the 2000 Liens were part and parcel of the same transaction. Indeed, BNY and the rest of the BNY lending group did not participate whatsoever in the 1994 Transaction or benefit therefrom. The Committee cannot cure this defect by arguing that the 1994 Transaction and the granting of the December 2000 Liens should be "collapsed" into one transaction.

[ (*BNY Br.,* pg. 14).]

Section 550(a) of the Bankruptcy Code provides as follows:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

[11 U.S.C. § 550 (West 2004).]

As the legislative history to § 550 clarifies, § 550 " 'prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee.' " *In re Toy King Distribs., Inc.,* 256 B.R. 1, 143 (Bankr.M.D.Fla.2000) (citations omitted). The structure of § 550(a) "separates initial transferees and beneficiaries, on the one hand, from immediate or mediate transferees, on the other.' " *Id.* (quoting *Bonded*

*Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 895 (7th Cir.1988)). While the liability of the initial transferee under § 550 is "strict," immediate or mediate transferees, however, are afforded a "good faith" defense under § 550(b) of the Code. *Id.* In order to recover from BNY or the Noteholders as mediate or immediate transferees, the Committee has the burden of proving that BNY or the Noteholders, or both, did not take the transfer for value and in good faith, and that they had knowledge of the voidability of the transfer. *See* 11 U.S.C. § 550(b)(1)(West 2004)[28]; *Belford v. Breck (In re Med. Cost Mgmt., Inc.)*, 115 B.R. 406, 409 (Bankr.D.Conn. 1990). Further, § 550(a)(2) will permit the Committee to pursue the subsequent transferees for avoided transfers "so long as the chain of possession can be established." *In re Toy King Distribs., Inc.,* 256 B.R. at 148 (citation omitted).

In support of its contention that BNY and the Noteholders are mediate or immediate transferees under § 550(a)(2), the Committee filed exhibits purporting to demonstrate the similarity of assets between the two transactions. (*See Supplemental Appendix on behalf of the Official Committee of Asbestos Claimants*). In reviewing these exhibits, all that can be discerned are the locations of manufacturing plants owned and operated by GAF. Simply put, this does not on this record establish conclusively that the "exact same assets" were involved in both transactions.

However, while the Court finds persuasive the arguments raised by G–I Holdings, BMCA, and BNY that the assets transferred between the two transactions are entirely different and the transactions themselves were distinct events, the issue before the Court on a motion to dismiss standard is not whether the Committee will ultimately prevail, but whether the Committee is entitled to offer evidence to support its claims. *In re Halpert & Co.,* 254 B.R. at 117. At this juncture, the Court cannot state that the Committee will be unable to prove definitively whether the assets subject to the Securitization transaction were the same or sufficiently related to the Pushdown transaction so as to permit recovery from BNY or the Noteholders. Consequently, the avoidance action challenging the Pushdown transaction under § 544(b) of the Code can include a claim for recovery against BNY and the Noteholders as mediate or immediate transferees pursuant to § 550(a)(2).

### (iii) Express Tolling

■ As a third theory demonstrating why the Pushdown transaction is not time-barred, the Committee submits that BMCA agreed to expressly toll all statutes of limitations, including § 546(a) of the Bankruptcy Code.[29] Specifically, the Committee contends that "[w]ith BMCA having voluntarily tolled 'all statutes of limitations and statutes of repose' that had not expired by the Petition Date, § 546(a) poses

---

**28.** Section 550(b) of the Code provides as follows: "The trustee may not recover under subsection (a)(2) of this section from—(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee."

**29.** Section 546(a) of the Code provides: "An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of(1) the later of(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or (2) the time the case is closed or dismissed."

no time bar to the proposed claim against BMCA for avoidance of the Pushdown under § 544(b)." (*Comm. Br.*, pg. 46).

Simply stated, § 546(a) is a statute of limitations for actions or proceedings brought under § 544 of the Code. 5 COLLIER ON BANKRUPTCY ¶ 546.01[1] (15th rev. ed.2003). Section 546(a) applies to fraudulent transfer actions commenced by a trustee under § 544(b) of the Bankruptcy Code and applicable state law. 5 COLLIER ON BANKRUPTCY ¶ 546.02[1][b] (15th rev. ed.2003). Section 546(a)(1) provides that an avoidance action must be commenced within two years from the entry of the order for relief. *See* 11 U.S.C. § 546(a)(1)(West 2004). This limitations period is designed to give the trustee some breathing room to determine what claims to assert under § 544. *Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933, 936–37 (D.Colo.1990). However, avoidance actions brought pursuant to § 544(b) obviously raise issues of state law limitation periods, in this case N.J.S.A. 25:2–31. "As long as the state law statute of limitations has not run before the debtor's filing for bankruptcy, the trustee can bring a fraudulent conveyance action as long as he [or she] complies with the provisions of § 546(a)." *Gibbons v. First Fid. Bank, N.A. (In re Princeton–New York Investors, Inc.)*, 199 B.R. 285, 294 (Bankr.D.N.J.1996)(quoting *In re Dry Wall Supply, Inc.*, 111 B.R. at 936), *aff'd*, 219 B.R. 55 (D.N.J.1998). *See also In re Bldgs. by Jaime, Inc.*, 230 B.R. 36, 45 (Bankr.D.N.J.1998)(noting that "actions brought under section 544 are subject to section 546(a) which expands the time during which the trustee can exercise avoidance rights, so long as the state statute of [limitations] has not run prior to his [or her] appointment") (citation omitted); *Eisenberg v. Feiner (In re Ahead By a Length, Inc.)*, 100 B.R. 157, 164 (Bankr.S.D.N.Y.1989)(holding that to sue successfully under § 544(b), "the trustee must have commenced suit within two years of her appointment ... on a cause of action which was viable under applicable law on the date that the bankruptcy petition was filed").

With respect to its express tolling theory, the Committee's argument is premised on two assumptions: 1) the tolling of the proposed state law fraudulent transfer action under § 544(b) based on the Preliminary Injunction; and 2) the tolling of the additional two-year limitations period under § 546(a) based on the Preliminary Injunction. In other words, assuming any fraudulent transfer action is not time-barred under N.J.S.A. 25:2–31, the Preliminary Injunction tolls the additional two-year limitations period under § 546(a), which would excuse the Committee's failure to file its adversary proceeding by January 5, 2003, or two years after G–I Holdings filed for bankruptcy. Quite specifically, the Preliminary Injunction only tolled fraudulent conveyance causes of action against BMCA "that had not expired as of January 5, 2001." Therefore, if the state law limitations period for a fraudulent transfer cause of action under § 544(b) had expired prior to January 5, 2001, the Committee cannot take advantage of the express tolling provision within the Preliminary Injunction, nor can it rely on § 546(a) for additional time to file an adversary complaint.

Applying these principles to the proposed challenge to the Pushdown transaction, the Committee can utilize the ten-year statute of limitations period provided to the NJDEP pursuant to N.J.S.A. 2A:14–1.2 and file an action based on constructive fraud under both N.J.S.A. 25:2–25b and N.J.S.A. 25:2–27a. However, any proposed fraudulent conveyance action premised on constructive fraud that is not

dependent upon the claim of the NJDEP as an existing unsecured creditor of G–I Holdings is time-barred because the four-year statute of limitations pursuant to N.J.S.A. 25:2–31b expired in February of 1998, almost three years before G–I Holdings filed for bankruptcy. *See* N.J.S.A. 25:2–31b (2002).

In addition, any fraudulent conveyance claim based on actual intent under N.J.S.A. 25:2–25a that does not rely on the discovery rule is similarly time-barred because by operation of N.J.S.A. 25:2–31a, any such cause of action needed to be filed before February of 1998. *See* N.J.S.A. 25:2–31a (2002). However, for the reasons expressed above, any claim for actual fraud premised on the discovery rule contained within N.J.S.A. 25:2–31a would not be time-barred so long as the Committee can identify a claimant who did not discover an asbestos-related injury prior to one year before G–I Holdings filed for bankruptcy. If the Committee can identify such a claimant, then the express tolling provision contained within the Preliminary Injunction, and the additional two-year period in § 546(a), would effectively toll any claims for actual fraud. Moreover, the Committee, by assuming the status of the NJDEP and receiving the benefit of the ten-year statute of limitations period, can also file a separate fraudulent transfer claim based on actual fraud pursuant to N.J.S.A. 25:2–25a.

### (iv) Equitable Tolling

■ The Committee raises the theory of "equitable tolling" as a final justification for why the proposed avoidance action challenging the Pushdown transac-

tion is not time-barred. (*Comm. Br.*, pg. 17). More particularly, the Committee claims that the applicable statutes of limitations have been equitable tolled "by reason of a series of stays, restraining orders, and injunctions." (*Comm. Br.*, pg. 17).[30] In support of this contention, the Committee relies on what it labels the "*Georgine* Injunction" as support for why the Pushdown transaction remains subject to challenge. Simply stated, the Committee asserts that the preliminary injunction issued by the United States District Court for the Eastern District of Pennsylvania in *Georgine v. Amchem Prods., Inc.,* 878 F.Supp. 716, 726–27 (E.D.Pa.1994), *vacated by,* 83 F.3d 610 (3d Cir.1996), *and aff'd sub nom, Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), suspended the running of the statute of limitations with respect to asbestos claimants, and "in combination with BMCA's voluntary tolling, has prevented the lapsing of fraudulent conveyance claims based on the Pushdown." (*Comm. Br.*, pg. 55).

■ Under the doctrine of equitable tolling, "plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.,* 165 F.3d 236, 240 (3d Cir.1999) (citations omitted). To invoke the doctrine of equitable tolling, a plaintiff must demonstrate that he or she exercised reasonable diligence in investigating and bringing his or her claim. *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1126 (3d

---

**30.** Although the Committee includes the theory of equitable tolling as a justification for why the proposed claims challenging the 1994 Pushdown transaction are not time-barred, it does so solely in the context of what

it labels the "*Georgine* Injunction" and its purported effect on this bankruptcy proceeding. Consequently, this Court will limit its discussion accordingly.

Cir.1997)(citing *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380 (3d Cir.1994)).

▮ Ordinarily, equitable tolling may be appropriate where: 1) the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; 2) the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or 3) the plaintiff has timely asserted his or her rights mistakenly in the wrong forum. *Id.* at 1125–26 (citing *Oshiver,* 38 F.3d at 1387). The question of whether a statute of limitations should be equitably tolled is necessarily a factual one and is usually not ripe for consideration on a motion to dismiss. *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.),* 238 B.R. 558, 577 (Bankr.S.D.N.Y.1999)(citing *Oshiver,* 38 F.3d at 1391). However, the Committee's reliance on the doctrine of equitable tolling with respect to the *Georgine* injunction has no bearing on this case for at least two reasons.

First, the injunction entered by the United States District Court for the Eastern District of Pennsylvania in *Georgine v. Amchem Prods., Inc.,* 878 F.Supp. 716, 726–27 (E.D.Pa.1994), only prohibited "all members of the class certified by the Court by order dated August 16, 1994" from initiating or prosecuting asbestos-related claims against the Center for Claims Resolution (hereinafter "CCR") defendants, to which GAF was a party. The Committee does not note the limitation to *certified class members* because from this it generalizes that the *Georgine* injunction barred "asbestos victims from pursuing their damages claims...." (*Comm. Br.,* pg. 56). Moreover, the Committee fails to identify any potential claimant in this matter who was a member of the class of claimants certified by the District Court for the Eastern District of Pennsylvania on August 16, 1994.

Second, even assuming G–I Holdings can be considered one of the CCR defendants based on its predecessor, GAF, the Committee attempts to "bootstrap" BMCA into the category of CCR defendants. The Committee states: "[f]rom and after September 21, 1994 [the date on which the district court entered the *Georgine* preliminary injunction], until August 27, 1997 [the date upon which the district court finally vacated the injunction after reversal on appeal], *BMCA was not exposed to suit by asbestos claimants, whether on their claims for personal injury or fraudulent conveyance claims derived therefrom.*" (*Comm. Br.,* pg. 57)(emphasis added). However, BMCA was never a CCR defendant and the effects of the *Georgine* injunction in tolling statutes of limitations, if any, cannot be applied to BMCA who was never a party to the preliminary injunction issued by the District Court for the Eastern District of Pennsylvania.

### b. Conclusion With Respect To The Pushdown Transaction

Based on the foregoing analysis, this Court shall grant the Committee leave to file an adversary proceeding challenging the 1994 Pushdown transaction on behalf of G–I Holdings asserting a fraudulent conveyance claim premised on actual fraud pursuant to § 544(b) of the Code and N.J.S.A. 25:2–25a against BMCA, BNY and the Noteholders. In the adversary complaint the Committee must specifically identify at least one claimant that did not become aware of any asbestos-related injury until one year prior to the date on which G–I Holdings filed for bankruptcy. Further, the Committee shall also be permitted to file claims based on both actual and constructive fraud on behalf of G–I Holdings under § 544(b) of the Code and

N.J.S.A. 25:25a, N.J.S.A. 25:2–25b and N.J.S.A. 25:27a against BMCA, BNY, and the Noteholders utilizing the standing of the NJDEP as an unsecured creditor of G–I Holdings. The Committee shall file its adversary complaint within thirty (30) days from the date of this decision.

### c. The 2000 Securitization Transaction

As previously noted, the Committee seeks to assert a second set of claims "attack[ing] the Securitization and subsequent payments to the BNY Banks and [the] Noteholders as voidable and recoverable transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and 550(a)." (*Comm. Br.*, pg. 6). The Committee intends to institute claims against the BNY Banks and the Noteholders "as initial, mediate, or immediate transferees of the encumbrances granted in the Securitization." (*Comm. Br.*, pg. 6). The Committee submits that these claims "will be predicated on the contention that BMCA must be collapsed with G–I [Holdings] on grounds of alter ego or substantive consolidation, or that the assets subjected to the liens constitute property of the Debtor that was fraudulently conveyed in the Pushdown." (*Comm. Br.*, pg. 6). Significantly, all of the Committee's proposed claims challenging the Securitization transaction are premised upon a condition precedent; namely, a judicial determination that BMCA is the alter ego of G–I Holdings or a decision substantively consolidating BMCA and G–I Holdings. (*See Comm. Appx.*, Volume 2, Exhibit "32"). However, these issues are not new to this bankruptcy proceeding. This Court, as well as the District Court of New Jersey, have both addressed these issues in connection with a prior refinancing by BMCA in 2003.

On March 18, 2003, BMCA provided notice to the Committee of its intention to replace the BNY Group's credit facilities, which were scheduled to expire in August, 2003, with a new facility (hereinafter the "Citibank Facility") by a group of new lenders led by Citibank (hereinafter "Citibank Group"). "The Citibank Facility offered to establish a secured revolving credit facility with a maximum credit limit of between $350 million and $375 million, which would refinance the existing $210 million credit facility provided by the BNY Group...." (*Comm. Appx.*, Vol. 2, Exhibit "20").[31] At the closing of the transaction, therefore, the BNY Group's loans to BMCA would be repaid in full; the Citibank Facility would be secured by liens encompassing virtually all of BMCA's assets, replacing the liens granted to the BNY Group.

G–I Holdings, BMCA, the Committee, and the Legal Representative did not oppose or seek to prevent the financing, but did seek to condition the refinancing. In its decision affirming this Court's denial of certain modifications to the February 22, 2002 Preliminary Injunction, the District Court characterized the nature of the dispute as follows:

> Specifically, BMCA, the Committee, and the Legal Representative sought to modify the preliminary injunction to provide that BMCA's entry into the Citibank Facility and usage of the Facility would not prejudice the rights, if any, that the Committee, the Legal Representative, or the bankruptcy estates of G–I [Holdings] or BMCA (if and when BMCA becomes a debtor in bankruptcy) may have against the BNY Group or the Noteholders in, among other things, actions that the Committee might bring in

**31.** Exhibit 20 is the February 4, 2004 written decision issued by The Honorable William G.

Bassler, U.S.D.J., on appeal from the June 17, 2003 decision rendered by this Court.

the future against BMCA, including actions seeking to avoid the liens that BMCA had given to secure the BNY Credit Facility.

As stated by the Committee, the rationale for the proposed modification was as follows: BNY and the Noteholders had enjoyed the benefit of the preliminary injunction for two years during which asbestos claimants had been restrained from prosecuting their claims against BMCA. These restraints prevented asbestos claimants from engaging in the "race of diligence" that generally determines priorities among creditors of nonbankrupts, such as BMCA. As G–I [Holdings] acknowledged when it moved [for] the preliminary injunction, without the benefit of that order, BMCA would have soon followed G–I [Holdings] into Chapter 11. Had BMCA filed Chapter 11, its prepetition debts could not have been repaid except pursuant to a plan of reorganization, and the liens held by the BNY Group and Noteholders would have been subject to immediate attack as preferential transfers.

Thus, the opportunity for BNY to receive payment from BMCA, which is one result of the Citibank refinancing, would not have arisen without the preliminary injunction. Accordingly, the Committee asserts that "simple fairness" dictates that the BNY Group and Noteholders should not be permitted to improve their position in relation to asbestos claimants by setting up, on the basis of the new Citibank refinancing, new legal defenses that would not otherwise exist as to the avoidance of their liens.

[ (*Comm. Appx.*, Vol. 2, Exhibit "20").]

Faced with these competing concerns, this Court held that the Committee's request for this Court to adjudicate the future rights or defenses, or both, between the parties was not ripe for judicial review because the Committee's contemplated preference and avoidance actions would require intervening events. (*Comm. Appx.*, Vol 2, Exhibit "19").[32] As such, this Court held that it could not modify the Preliminary Injunction as requested by the Committee because doing so would be tantamount to asserting jurisdiction over a possible or conjectural controversy, or issuing an advisory opinion. (*Comm. Appx.*, Vol 2, Exhibit "19").

On appeal to the District Court, the Committee continued to argue that this Court had jurisdiction to modify the Preliminary Injunction. According to the Committee, "the BNY Group and Noteholders should be prevented from deriving the advantage of acquiring new rights or defenses from the refinancing of BMCA's debt while the [Preliminary Injunction] restrains the asbestos claimants from prosecuting their claims against BMCA." (*Comm. Appx.*, Vol. 2, Exhibit "20"). The District Court affirmed this Court's June 17, 2003 decision, concluding that this Court correctly found that it did not have subject matter jurisdiction to adjudicate whether BNY could possibly assert any defenses in subsequent proceedings, particularly an action in which the Committee or Legal Representative sought to avoid the liens granted by BMCA to secure the BNY Credit Facility. (*Comm. Appx.*, Vol. 2, Exhibit "20").

In affirming this Court's decision, the District Court stated as follows:

In this case, the controversy is not "of sufficient immediacy and reality" because the Committee's asserted "claim" is based on at least four uncertain and

---

**32.** Exhibit 19 is the transcript of the June 17, 2003 oral decision rendered by this Court

with respect to the 2003 refinancing transaction.

contingent events. As BNY argues, before the Committee can even bring an action against BNY seeking to avoid the liens given by BMCA in December 2000, the following uncertain and contingent events would first have to occur: (1) the Committee must prevail in the Successor Liability Action and establish that BMCA is liable for G–I's asbestos liabilities; (2) BMCA must file for bankruptcy relief; then (3) the Committee must succeed in getting the resultant BMCA estate substantively consolidated with the G–I [Holdings] estate; and finally (4) the Committee must successfully make the substantive consolidation retroactive to the January 5, 2001 Petition Date. As BNY further points out, such speculative future "claim," which does not now exist and may never exist, does not even belong to G–I [Holdings] or its creditors because it relates to liens granted by BMCA rather than G–I [Holdings]. The Committee does not dispute or otherwise address the fact that these contingent events would need to occur before it could file an avoidance claim against BNY, or that such events may not ever occur. Accordingly, while a court does generally have the power to modify its own preliminary injunction, the relief sought by the Committee presents a controversy too remote for judicial review.

[ (*Comm. Appx.*, Vol. 2, Exhibit "20").]

The District Court's conclusion on the issue of ripeness is equally applicable and pertinent to the present motion pending before this Court. In fact, the posture of this motion is strikingly similar to the Committee's previous request to modify the Preliminary Injunction. Like the dispute surrounding the 2003 refinancing transaction, the Committee is once again requesting, albeit through the filing of a proposed adversary complaint, to have any future avoidance rights it may have against the BNY Banks and Noteholders preserved should the pending financing transaction proceed. By modifying the Preliminary Injunction and permitting it to file an adversary complaint seeking to avoid the Securitization transaction, the Committee is again attempting to circumvent any future defenses the BNY Banks and the Noteholders may have to such an avoidance action.

Moreover, the Committee itself recognizes that its attempt to challenge the Securitization transaction by filing an adversary proceeding is premised upon contingent and uncertain events. For example, the proposed Summary of Claims filed by the Committee dealing with the Securitization transaction all contain the following qualifying language: "if BMCA is determined to be the alter ego of G–I [Holdings] or is substantively consolidated with G–I [Holdings]." (*Comm. Appx.*, Vol. 2, Exhibit "32").[33] Further, the Committee's own description of its proposed claims with respect to the Securitization transaction also notes the contingencies that must occur before the avoidance claims challenging the Securitization transaction become ripe:

> The second set of claims will attack the Securitization and subsequent payments to the BNY Banks and Noteholders as voidable and recoverable transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and 550(a). The BNY Banks and Noteholders will be joined on these claims as initial, mediate, or immediate transferees of the encumbrances granted in the Securitization. *These claims*

---

**33.** This qualifying language is contained within proposed Counts Three, Four, Five, and Six.

*will be predicated on the contention that BMCA must be collapsed with G–I [Holdings] on grounds of alter ego or substantive consolidation, or that the assets subjected to the liens constitute property of the Debtor that was fraudulently conveyed in the Pushdown.*

[ *(Comm. Br.,* pg. 6)(emphasis added).]

■ As stated by the Third Circuit Court of Appeals, " '[t]he existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief.' " *Peachlum v. City of York,* 333 F.3d 429, 433 (3d Cir.2003) (citation omitted). The function of the ripeness doctrine "is to determine whether a party has brought an action prematurely, . . . and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Id.* (citation omitted); *see also Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)(noting that the ripeness doctrine requires that the challenge grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete, not hypothetical or abstract").

■ The following considerations underpin the ripeness doctrine: 1) whether the parties are in a sufficiently adversarial posture to be able to present their positions vigorously; 2) whether the facts of the case are sufficiently developed to provide the court with enough information on which to decide the matter conclusively; and 3) whether a party is genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one. *Peachlum,* 333 F.3d at 433–34 (citation omitted). The ultimate question in each case "is whether the facts alleged show that there is a substantial controversy, between parties having adverse legal interests, 'of sufficient immediacy and reality' to justify judicial resolution." *Id.* at 434 (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). Finally, where a plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be "sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong World Indus.; Inc. v. Adams,* 961 F.2d 405, 411–12 (3d Cir.1992) (citation omitted).

■ In this instance, the Committee cannot satisfy its burden of presenting a colorable claim to challenge the 2000 Securitization transaction at this time because a valid affirmative defense to the proposed action exists; namely, lack of subject matter jurisdiction. *See CCAIR, Inc.,* 29 F.3d at 859. Because the Committee's proposed avoidance action is premised on the contingent event of a judicial determination of alter ego status or substantive consolidation, matters which remain pending in this Court in the Substantive Consolidation Action and in the District Court in the Successor Liability Action, the Court cannot conclude that the proposed avoidance action challenging the Securitization transaction is of "sufficient immediacy and reality to justify judicial resolution." *Peachlum,* 333 F.3d at 434.

Contrary to the Committee's contentions, any defenses BNY or the Noteholders may assert in the future if the financing transaction were allowed to proceed do not presently harm the Committee. Rather, any potential harm to the Committee can only occur if and when BNY or the Noteholders actually assert such a defense in a suit by the Committee. Whether BNY and the Noteholders will ever have an opportunity to assert any legal defenses is neither imminent nor certain to occur. The Committee must first succeed in the Successor Liability Action or the Substan-

tive Consolidation Action, or both. As the District Court concluded a few months ago, "the Committee cannot be 'genuinely aggrieved' by a matter which has not yet caused it any harm." (*Comm. Appx.*, Vol. 2, Exhibit "20").

Consequently, this Court concludes that the Committee has failed to present a colorable claim at this time with respect to the Securitization transaction, and will deny the Committee's request to file an adversary proceeding on behalf of G–I Holdings challenging this transaction. However, in the event that the Committee is successful in either the Successor Liability Action or the Substantive Consolidation Action, the Committee will be permitted to once again seek leave from the Court to file such an adversary proceeding.[34]

### d. The Committee's Independent Theory For Challenging The Securitization Transaction.

 In addition to the previously addressed arguments raised by the Committee with respect to its proposed challenge to the Securitization transaction, the Committee submits that G–I Holdings' bankruptcy estate currently has "proper standing to attack the Securitization under the avoidance provisions of the Bankruptcy Code." (*Comm. Br.*, pg. 34). In support of this contention, the Committee submits that G–I Holdings and BMCA "constitute, in reality, one and the same entity. The Committee asserts that the corporate veil that supposedly separates these commonly-controlled corporations was interposed for the unjust purpose of insulating assets from pre-existing mass tort litigation and thereby hindering, delaying, and defraud-

ing asbestos victims." (*Comm. Br.*, pg. 34).

Therefore, the Committee contends, "parent and subsidiary must be collapsed together by way of an alter ego determination or an order of substantive consolidation, under which the assets now held in BMCA's name can be recognized as property of the estate." (*Comm. Br.*, pgs. 34–35). In contrast, G–I Holdings and BMCA argue that "[b]efore the Committee has standing to pursue its fraudulent conveyance action, it either has to substantively consolidate the BMCA and G–I [Holdings] estates or otherwise reverse pierce the corporate veil." (*Debtor's Br.*, pg. 30). In support of their arguments, the parties principally rely on three cases: *Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc.)*, 479 F.2d 410 (2d Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371 (Bankr.S.D.N.Y.1998); and *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr.S.D.N.Y.1999).

For the reasons expressed above, this Court concludes that the Committee does not have a colorable claim at this time, and thus no standing, to pursue independent causes of action challenging the Securitization transaction. As BMCA and G–I Holdings aptly note, the Committee's request for this Court to find independent reasons upon which the Committee can challenge the Securitization transaction already form the basis for the Successor Liability and Substantive Consolidation Actions, matters pending before the Dis-

---

**34.** Because the Securitization transaction occurred in 2000, the Preliminary Injunction should serve to toll any applicable statute of limitations as to G–I Holdings and BMCA. Nevertheless, the Court will permit G–I Hold-ings, BMCA, BNY, and the Noteholders to assert any viable defenses to a ripe adversary complaint seeking to avoid the Securitization transaction, provided the Committee satisfies the contingencies described above.

trict Court and this Court, respectively. Consequently, this Court will not interfere with those continuing proceedings by making final determinations not properly before the Court at this time. Nevertheless, for purposes of completeness, the Court will briefly set forth the arguments raised by the parties on this issue.

In *In re Beck Industries, Inc.,* the United States Court of Appeals for the Second Circuit addressed the issue of whether the bankruptcy court had jurisdiction under the Bankruptcy Act to restrain Maryland state court proceedings against a wholly-owned subsidiary of the debtor, *Beck Industries, Inc.,* 479 F.2d at 411. The Second Circuit Court of Appeals reversed the decision reached by the bankruptcy court, which held that because the wholly-owned subsidiary "was a mere adjunct or instrumentality" of the debtor, the bankruptcy court was permitted to "disregard its separate corporate existence and pierce the corporate veil." *Id.* at 412. Within its decision, the Second Circuit Court of Appeals stated the general proposition that the Bankruptcy Act did not authorize the bankruptcy court to enjoin a suit against a solvent independent subsidiary of the debtor "merely because its stock is held by the debtor in reorganization." *Id.* at 415 (citation omitted). That is, without proof that the subsidiary "was a mere sham or conduit rather than a viable entity," the bankruptcy court lacked jurisdiction under § 516(4) of the Bankruptcy Act to enjoin the state proceeding against the subsidiary. *Id.* at 416.[35] Contrary to the findings of the bankruptcy court, the Second Circuit Court of Appeals concluded that "far from being a mere instrumentality" of

the debtor, the subsidiary "operated as a viable, independent going commercial concern." *Id.* at 417.

Despite the outcome of *In re Beck Industries, Inc.* and the general rule articulated by the Second Circuit Court of Appeals, the Committee relies on what is arguably *dicta* to support its position in this matter. The Second Circuit Court of Appeals stated that had it accepted the factual findings reached by the courts, "[i]t must be conceded that the general rule against enjoining a suit against a solvent subsidiary of the debtor is not inflexible ... and that the meaning of the term 'property' turns on the particular facts of each case ... which may in some instances permit piercing of the corporate veil." *Id.* (internal citations omitted). From this statement, the Committee submits:

> The Committee's opponents will undoubtedly contend that under *Beck,* an estate representative's claims to avoid and recover transfers from a parent-debtor's subsidiary are not made colorable by virtue of well-pled allegations that the subsidiary is an alter ego of the debtor if those allegations have been challenged. By this way of thinking, the Committee should be forced to establish the ultimate merits of its alter ego theory before the courthouse doors will be open to it to challenge the Securitization. But the case law under *Beck* rejects this way of thinking.
>
> [ (*Comm. Br.,* pgs. 36–37).]

In *In re Regency Holdings (Cayman), Inc.,* the Chapter 11 debtor, a holding company, brought an adversary proceeding to recover, as preferential transfers,

---

**35.** Section 516(4) of the former Bankruptcy Act provided as follows: "[u]pon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties in this chapter conferred and imposed upon him and the court(4) in addition to the relief provided by section 29 of this title, enjoin or stay until final decree the commencement or continuation of a suit against the debtor or its trustee or any act or proceeding to enforce a lien upon the property of the debtor."

loan repayments made by its subsidiary and its subsidiary's subsidiary. 216 B.R. at 373. The Bankruptcy Court for the Southern District of New York noted the general rule that "parent and subsidiary corporations are separate entities, having separate assets and liabilities." 216 B.R. at 375 (citing *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 643 (3d Cir.1991), *cert. denied*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992)). "The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's." *Id.* (citing *In re Beck Indus., Inc.*, 479 F.2d at 415–16). As such, "the parent's creditors have no claim to the subsidiary's assets, and *vice versa*. A party seeking to overcome the presumption of separateness must pierce the corporate veil, or prove that the two entities should be substantively consolidated." *Id.* (citing *Helena Chem. Co. v. Circle Land & Cattle Corp. (In re Circle Land & Cattle Corp.)*, 213 B.R. 870, 874–76 (Bankr.D.Kan.1997)).

After articulating these general principles, the bankruptcy court noted as follows:

> Acknowledging the general rule, Holdings [the debtor-holding company] recognizes that the funds transferred from the accounts of Cruises [its subsidiary] and Maritime [its subsidiary's subsidiary] to the defendants were not its property. Moreover, at an earlier hearing, Holdings conceded that its judgment creditor could not have executed on the Cruises or Maritime accounts, or have forced Holdings to use the funds in those accounts to pay the judgment creditor. Finally, Holdings has not requested substantive consolidation, and has not sought to pierce the corporate veil.
>
> Instead, Holdings focuses on its ability to control Cruises's and Maritime's as-

sets through its corporate governance rights. Holdings maintains that as sole shareholder of Cruises, it could amend Cruises's corporate by-laws, elect or remove its directors, appoint its officers, manage its business, and hence, control the disposition of its assets. By extension, Holdings could exercise these same powers with respect to Maritime, the wholly-owned subsidiary of Cruises. From this, Holdings concludes that the transfer of the funds effectively transferred those valuable control rights too. [*Id.*].

From this analysis, the Committee claims the "clear implication of *Regency Holdings* is that a *request* for substantive consolidation, or actions *seeking* to pierce the [corporate] veil, will defeat a facial challenge to standing when a parent-debtor or its estate representative sues to avoid a transfer made by the parent's subsidiary." (*Comm. Br.*, pg. 37)(emphasis in original). As with *In re Beck Indus., Inc.*, BMCA and G–I Holdings disagree with the Committee's interpretation of the import of *In re Regency Holdings (Cayman), Inc.* and its applicability to this matter, noting "the Committee's argument [that] it merely needs to show it has made a request for substantive consolidation for the purposes of piercing the corporate veil to meet the colorable claim test is patently false. . . ." (*Debtor's Br.*, pgs. 30–31).

 Despite this assertion by BMCA and G–I Holdings, the decision reached by the United States Bankruptcy Court for the Southern District of New York in *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr.S.D.N.Y.1999), arguably may support the Committee's position that it may have independent standing to challenge the Securitization transaction on a theory of "reverse corporate veil pierc-

ing." [36] "Traditionally, a third party seeks to pierce the corporate veil in order to circumvent [the] protective [corporate] structure and hold the parent corporation accountable for the liabilities of its subsidiary." 234 B.R. at 322 (citations omitted). Generally, piercing the corporate veil requires a showing "that the parent corporation dominates the subsidiary to such an extent that the latter is really an agent or instrumentality of the former and the parent corporation used that control to commit fraud or some other wrong that injured the party seeking to pierce the veil." *Id.* (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997)). However, to "accommodate the differences between the traditional and non-traditional veil piercing situations, the domination requirement of the traditional test needs to be relaxed in favor of finding a control relationship between the parent and the subsidiary." *Id.* at 323 (citation omitted). The bankruptcy court in *Stratton Oakmont, Inc.* applied this modified standard to the reverse veil piercing context. *Id.* at 323–25. *See also In re Blatstein,* 192 F.3d 88, 100 (3d Cir.1999) (noting that under Pennsylvania law only "exceptional circumstances" warrant granting this "unusual" remedy . . . a court should use its equitable powers to disregard the corporate forum only if reverse piercing of the veil will prevent fraud, illegality, injustice or a contravention of public policy).

Based upon the decision in *Stratton Oakmont, Inc.,* the requirements for pleading a reverse veil piercing claim may not be as onerous as both BMCA and G–I Holdings suggest. Based on the factual record before the Court, the Committee may be able to bear its burden of pleading the requisite degree of control between BMCA and G–I Holdings. *See, e.g.,* 234

B.R. at 324. However, because the Committee's request to challenge the Securitization transaction under an independent legal theory, namely, piercing the corporate veil under applicable state law, already forms the basis for the Successor Liability and Substantive Consolidation Actions, in addition to the lack of ripeness of the claim discussed above, this Court will not permit the Committee to assert the same cause of action in its proposed adversary proceeding.

## B. BMCA's Request To Issue New Senior Secured Notes

■ With respect to the request by BMCA to issue new senior secured notes, BMCA submits that "the refinancing is a prudent exercise of BMCA's good business judgment." (*G–I Reply Br.,* pg. 20). Admittedly, the Committee does not contest BMCA's business judgment regarding the refinancing of its outstanding notes. (*Comm. Reply Br.,* pg. 12). However, the Committee does object to the proposed use of BMCA's existing line of credit to prepay outstanding notes. (*Comm. Reply Br.,* pg. 12). More specifically, the Committee asserts that this Court should prohibit "BMCA from drawing on its short-term revolving credit facility to fund the redemption or pre-payment of long-term obligations." (*Comm. Reply Br.,* pg. 2).

During the February 24, 2004 deposition of John F. Rebele, Senior Vice–President and Chief Financial Officer of BMCA, Mr. Rebele testified that BMCA would not redeem the outstanding 2006 notes using the existing line of credit prior to closing "unless there were adequate measures in place to secure the liquidity of the business." (*Debtor's Appx.,* Exhibit "21," pg. 97). When pressed to specify the "adequate measures" necessary to protect the

---

**36.** Reverse corporate veil piercing occurs, *inter alia,* when a plaintiff seeks to hold a subsidiary liable for the debts of its parent company.

liquidity of BMCA, Mr. Rebele noted that an underwriting agreement between BMCA and an underwriter would take the risk off BMCA and place it upon the underwriter. (*Debtor's Appx.*, Exhibit "21," pgs. 97–98).

In response to the assurances made by Mr. Rebele during his deposition, the Committee states as follows:

[I]n an effort to mollify the financial markets, [G–I Holdings] and BMCA are willing to blindly assume significant risks associated with using short term debt to refinance long term debt that ordinarily prudent management would not take in order to facilitate the prepayment of obligations due to existing bondholders. Although [G-I Holdings] and BMCA attempt to assure the Court that they will take no action that puts BMCA's liquidity at risk, despite repeated request, they have been unable to produce an underwriting agreement that transfers all risks associated with the proposed transactions to the bond underwriters or some other third party. Given the highly unusual proposed use of BMCA's short term credit line and the potential risks involved, the Court should not permit BMCA unfettered use of its line of credit to pre-pay its outstanding bond debt.

[ (*Comm. Reply Br.*, pg. 35).]

The issue raised by the Committee with respect to the proposed refinancing transaction strikes at the heart of BMCA's business decisions. As previously noted by this Court during the July 19, 2001 hearing, while BMCA is a party to the Preliminary Injunction, it was never this Court's intention to prevent BMCA, significantly a non-debtor, from conducting business and engaging in normal course transactions. (*Debtor's Appx.*, Exhibit "12," pg. 64). Moreover, regarding BMCA's decision to repay its outstanding debt, this Court previously stated as follows:

But, in terms of repayment of debt that would normally be repaid, I assume that—I would be hard pressed to stop the repayment of normal debt obligations. That wasn't ever meant to be an outcome of this injunction proceeding or any conditions pertinent thereto. Certainly, information should be provided. But, BMCA has to be able to operate as an ongoing business. We are not talking about insider transactions or transactions that are generally given greater scrutiny and are suspect, but we are talking about transactions between an arms length party, and subject to reporting requirements of a public company. Let's put it in proper context because I was never intending to put those kind of [strictures] on a non-debtor public company.

[ (*Debtor's Appx.*, Exhibit "12," pgs. 65–66).]

██ On the issue of the exercise of a debtor-in-possession's business decision and judgment, a debtor-in-possession's business decision " 'should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.' " *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr.D.Mass.2001) (quoting *In re Logical Software*, 66 B.R. 683, 686 (Bankr. D.Mass.1986)). *See also In re UNR Indus., Inc.*, 30 B.R. 609, 612 (Bankr.N.D.Ill.1983)(noting that Congress intended to "allow debtors-in-possession, standing in the shoes of trustees, to conduct business as usual after the filing of Chapter 11, which does not encompass day-to-day input from creditors").

Here, BMCA, a non-debtor, complied with the Preliminary Injunction by providing adequate notice to the Committee in advance of the proposed refinancing transaction. Based upon this Court's stated intention in crafting the Preliminary In-

junction, together with the standard set forth in the *Aerovox* decision (assuming that this standard even applies to a non-debtor entity subject to a bankruptcy court's injunction order), this Court will not prevent BMCA, a non-debtor, from consummating its proposed refinancing transaction.

Simply stated, this Court is not in a position to supplant the financial expertise and knowledge of the bond markets possessed by BMCA's Vice–President and Chief Financial Officer, who has testified in depositions that the possible utilization of BMCA's credit line facility in the refinancing transaction would not jeopardize BMCA's business or liquidity. Whether the use of BMCA's credit line facility to repurchase its outstanding notes is a sound business decision is not for this Court to decide, and the Committee does not contend, nor does this Court find, that the decision to specifically utilize the credit line facility is the result of bad faith, whim, or caprice. *In re Aerovox, Inc.,* 269 B.R. at 80. Therefore, this Court will deny the Committee's request for an order preventing BMCA from proceeding with the proposed refinancing transaction, including the issuance of up to $150 million of new senior secured notes or using its credit line facility to prepay or repurchase the outstanding note obligations, or both. Moreover, the Committee's request for a thirty (30) day interim period before BMCA can execute the refinancing transaction, so as to enable the Committee to file and serve its proposed adversary proceeding, is also denied.

## IV. Conclusion

Based on the foregoing, this Court shall grant the Committee leave to file an adversary proceeding challenging the 1994 Pushdown transaction on behalf of G–I Holdings asserting a fraudulent conveyance claim against BMCA, BNY, and the Noteholders pursuant to § 544(b) of the Code. Claims premised on constructive fraud may be brought by the Committee utilizing the standing of the NJDEP as an unsecured creditor. However, any proposed fraudulent conveyance action premised on constructive fraud that is not dependent upon the claim of the NJDEP as an existing unsecured creditor of G–I Holdings is time-barred because the four-year statute of limitations pursuant to N.J.S.A. 25:2–31b expired in February of 1998, almost three years before G–I Holdings filed for bankruptcy.

Moreover, the Committee can also institute a claim based on actual fraud that is not dependent upon the standing of the NJDEP by specifically identifying at least one claimant in the adversary complaint that did not become aware of any asbestos-related injury until one year prior to the date on which G–I Holdings filed for bankruptcy. That is, a claim for actual fraud premised on the discovery rule contained within N.J.S.A. 25:2–31a would not be time-barred so long as the Committee can identify a claimant who did not discover an asbestos-related injury prior to one year before G–I Holdings filed for bankruptcy. If the Committee can identify such a claimant, then the express tolling provision contained within the Preliminary Injunction, and the additional two-year period in § 546(a), would effectively toll any claims for actual fraud. However, any fraudulent conveyance claim based on actual intent under N.J.S.A. 25:2–25a that does not rely on the discovery rule is similarly time-barred because by operation of N.J.S.A. 25:2–31a, any such cause of action needed to be filed before February of 1998. Moreover, the Committee, by assuming the status of the NJDEP and receiving the benefit of the ten-year statute of limitations period, can also file a separate fraudulent transfer claim based on actual fraud pursuant to N.J.S.A. 25:2–25a. The avoidance action challenging the Pushdown Transaction can include a claim for recov-

ery against BMCA as the initial transferee under 11 U.S.C. § 550(a)(1), and against BNY and the Noteholders as mediate or immediate transferees under 11 U.S.C. § 550(a)(2).

The Committee shall file its adversary complaint within thirty (30) days from the date of this decision.[37]

Finally, BMCA shall be permitted to execute its proposed refinancing transaction with no restraints going forward, by the issuance of up to $150 million of new senior secured notes or the draw-down of its existing line of credit facility to repay or repurchase the outstanding note obligations, or both.

An Order shall be submitted in accordance with this Opinion.

---

37. The Committee has requested thirty (30) days to search out the identity of persons, including Noteholders, to be joined as defendants in the contemplated adversary action. This Court has allowed the Committee thirty (30) days to file the Complaint. This does not, however, support restraints on the proposed refinancing transaction which may proceed in the normal course.